STATE OF NEBRASKA, APPELLEE, V. MICHAEL P. BENNETT, APPELLANT.

365 N.W.2d 423

Filed March 29, 1985.   No. 84-585.

Donald W. Kleine, for appellant.

Paul L. Douglas, Attorney General, and Mel Kammerlohr, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Defendant-appellant, Michael P. Bennett, was convicted, pursuant to a jury verdict, of burglary. In this appeal he urges

that the conviction should be set aside as (1) he was denied his right to a speedy trial and (2) the verdict is clearly wrong. The record supports neither contention, and we accordingly affirm.

This proceeding began with the filing of an information on February 10, 1983. The first trial thereon resulted in a mistrial on July 22, 1983. A new trial was scheduled for October 5, 1983, for which Bennett did not appear. As a consequence, a warrant was issued resulting in his arrest on April 8, 1984. The trial resulting in the aforesaid conviction commenced on June 4, 1984, at which time Bennett's motion for dismissal on the ground that he was denied a speedy trial was overruled.

Neb. Rev. Stat. § 29-1207 (Reissue 1979) requires that every person informed against be brought to trial within 6 months thereof. In the case of a mistrial such 6-month period is deemed to begin on the date the mistrial is ordered. This statute excludes from the computation of the 6-month period any "delay resulting from the absence or unavailability of the defendant."

Neb. Rev. Stat. § 29-1208 (Reissue 1979) mandates the absolute discharge of an accused if compliance is not had with § 29-1207.

It is clear that it is the State's burden to prove by a preponderance of the evidence that there has been compliance with § 29-1207. See, *State v. Beck*, 212 Neb. 701, 325 N.W.2d 148 (1982); *State v. Bolton*, 210 Neb. 694, 316 N.W.2d 619 (1982); *State v. Johnson*, 201 Neb. 322, 268 N.W.2d 85 (1978).

Although Bennett claims that he was available at all times and simply was not notified of the trial scheduled for October 5, his then trial attorney testified to the contrary. The trial attorney testified that she had been contacted by the trial judge on October 3, 1983, concerning the scheduling of a trial. She had a conference with Bennett in her office on that very same day, at which a proposed plea bargain was presented to him. At that time he indicated he would come in later to accept the bargain but wanted to talk it over with his girl friend. He did not return, the trial judge scheduled the October 5 trial, and the attorney left a message advising Bennett of that fact at his mother's house, where she had been told to call him. Bennett called his attorney's office on October 6, 1983, and was advised that a warrant had been issued for his arrest because of his

failure to appear for trial as scheduled. His attorney had at least two subsequent conversations with Bennett, at which she advised him to surrender to the police.

The trial attorney's testimony fulfills the burden the State was required to meet in order to excuse the delay from October 5, 1983, to April 8, 1984, because of the "absence or unavailability of the defendant." Subtracting that period results in a trial within the time requirement imposed by § 29-1207.

Bennett places heavy reliance on *State v. Beck, supra,* wherein we held that where there was no evidence the defendant had been unavailable and no evidence he had ever, either personally or through counsel, been notified to appear, the State had failed to meet its burden. That simply is not the situation presented by this case. Here, there is evidence, albeit contradicted, that Bennett was notified by the means he had requested but nonetheless failed to appear for trial. The trial judge listened to the evidence and so found. In *Beck* we said: "We can accord no weight to findings which find no support in the evidence." 212 Neb. at 704, 325 N.W.2d at 151. Here, the finding of the trial court is supported by the record. We can and do accord weight to that finding. Rather than a situation such as presented in *Beck*, this case falls within the rule which states that one cannot take advantage of a delay in being brought to trial where he is responsible for the delay either by action or inaction. *State v. Craig, ante* p. 70, 361 N.W.2d 206 (1985).

There being no merit to Bennett's first argument, we turn to his second.

The manager of the Wayside Inn Motel in Omaha, Nebraska, testified that around 8 to 8:15 in the evening of February 1, 1983, he was watching television in the room in which he and his wife lived. He heard a noise outside and, after opening the front door, observed a maroon four-door Cadillac out in front. He then walked out into the walkway in front of his second-floor room and saw two men apparently coming out of the meeting room directly below. Since the walkway hung out past the door below, he did not actually see the two come out of the door. One of the men he saw was carrying a television set which was partially covered by a sheet. After the manager yelled at them the man carrying the set threw it onto the back seat of the

Cadillac and got into the back seat beside it. The other man got in the front passenger's seat. A third man who had remained behind the wheel then drove away. The manager got the license number, and his wife telephoned the police, giving them a description of the car and its license number.

Upon investigation the manager discovered the door to the meeting room, which was last previously checked and found to be locked at 2:30 p.m., was now ajar and a television set which had been on a stand inside the door was gone. Although there were no signs of forced entry into this room, footprints in the freshly fallen snow indicated that the two men had come out of it.

The next morning, when the maids reported to work, it was discovered that the maids' supply room, eight rooms north of the meeting room, had been broken into. The door to this room had been forcibly opened and the doorjamb torn out. The master keys fitting every room and kept in the maids' room were missing.

A police officer testified that at approximately 8:25 on the evening of February 1, he received a radio broadcast describing the Cadillac and giving the license number. At 8:30 he spotted the car and followed it, but did not try to stop it until another patrol car arrived. The three male occupants of the car were then apprehended. One was identified as Bennett and the others as Ernest Tanner and Kevin Floyd. No television sets were found by the police in the Cadillac, but a bag containing various tools was found in the back seat.

At trial Tanner, having previously pled guilty to a burglary charge arising out of the same incident, became a witness against Bennett. Tanner was the owner, and had been the driver, of the Cadillac. He testified that he picked up Bennett about 7 p.m. on February 1, 1983. Floyd, who had been picked up after Bennett, began talking about stealing a television set. Tanner and Bennett, sitting in the front seat, did not join in this conversation. Floyd directed Tanner to pull into the Wayside Inn. Tanner realized that the purpose of going to the Wayside Inn was to allow Floyd to steal a television set. Floyd then left the car, returning in about 20 minutes carrying a television set that he put in the back seat. Floyd then returned to the same

room from which he had just carried the television set and called for Bennett. In response Bennett got out of the Cadillac for the first time. Tanner at first testified that Bennett had only stepped out of the car for a "split second" before someone began to yell, and then got back in. When confronted with the testimony he had given at Bennett's first trial, Tanner admitted that Bennett was gone for approximately 5 minutes, but he did not see whether Bennett went into the meeting room. Tanner thought Floyd was the one carrying the second television set back. Tanner's testimony in Bennett's earlier trial was that both Bennett and Floyd had handled the television sets, whereas his later testimony was that only Floyd had touched them.

According to Tanner, the three, after leaving the motel, stopped behind an apartment complex where Floyd left the television sets so that if they were stopped by the police, they would not have the stolen property with them. The police did stop and arrest them shortly thereafter. That same evening, Tanner gave a statement and showed the police where the television sets and the sheet had been left. The apartment manager did not realize two sets were stolen until the police informed him that two had been recovered.

Bennett testified that the reason Floyd was picked up was so they could go to work that evening. Bennett also stated he was sitting in the front seat on the passenger's side, and he was not paying much attention to the ongoing conversation because he was tired. He realized Floyd was going to do something wrong, but Bennett never took part in the conversation.

According to Bennett, after Floyd took the first television set, Floyd went back into the room and then told Bennett in a threatening manner to "come here." After Bennett "walked to the door" Floyd instructed Bennett to take one of the television sets, but Bennett did not comply and instead headed for the car, with Floyd following behind.

Bennett also testified that they then drove to the rear of an apartment complex where Floyd left the two television sets after Bennett refused to assist him. Once arrested, Bennett denied any knowledge of the burglary, since he was afraid Floyd would harm him if he divulged anything.

The two substantive statutes involved are Neb. Rev. Stat.

§§ 28-507 and 28-206 (Reissue 1979). Section 28-507(1) reads: "A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value." Section 28-206 provides: "A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender."

Aiding and abetting involves some participation in the criminal act and must be evidenced by some word, act, or deed. No particular acts are necessary, nor is it necessary that any physical part in the commission of the crime is taken or that there was an express agreement therefor. Mere encouragement or assistance is sufficient. *State v. True*, 210 Neb. 701, 316 N.W.2d 623 (1982); *State v. Dirgo*, 196 Neb. 36, 241 N.W.2d 351 (1976); *State v. Foster*, 196 Neb. 332, 242 N.W.2d 876 (1976).

Moreover, in determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact. The verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Schroder*, 218 Neb. 860, 359 N.W.2d 799 (1984); *State v. Brennen*, 218 Neb. 454, 356 N.W.2d 861 (1984); *State v. Meis*, 217 Neb. 770, 351 N.W.2d 79 (1984).

Tanner's testimony from Bennett's first trial, stating that Bennett had handled the television sets, was admissible as substantive proof in his second trial. Neb. Rev. Stat. § 27-801(4)(a)(i) (Reissue 1979) states:

> A statement is not hearsay if: (a) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (i) inconsistent with his testimony and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition.

The evidence was indeed sufficient to enable the jury to find that Bennett had assisted in the commission of the burglary and

therefore had aided and abetted it.

The judgment of the trial court is entirely correct and is therefore affirmed.

AFFIRMED.