454 N.W.2d 294 (1990)
235 Neb. 151
Donald DENESIA, Personal Representative of the Estate of Lucille Denesia, Deceased, Appellant,
v.
ST. ELIZABETH COMMUNITY HEALTH CENTER, a Nebraska Corporation, et al., Appellees.
No. 87-996.
Supreme Court of Nebraska.
April 26, 1990.
*296 Denzel R. Busick, of Luebs, Dowding, Beltzer, Leininger, Smith & Busick, Grand Island, for appellant.
William M. Lamson, Jr., and Patricia A. Zieg, of Kennedy, Holland, DeLacy & Svoboda, Omaha, for appellee St. Elizabeth Community Health Center.
Fredric H. Kauffman and Sonya S. Ekart, of Cline, Williams, Wright, Johnson & Oldfather, Lincoln, for appellee Bare.
Walter E. Zink II and Gail S. Perry, of Baylor, Evnen, Curtiss, Grimit & Witt, Lincoln, for appellee Gard.
BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.
*297 CAPORALE, Justice.

I. INTRODUCTION
In this suit joining an action for the wrongful death of Lucille Denesia and an action on behalf of her estate, the plaintiff-appellant, Donald Denesia, personal representative of the aforesaid decedent's estate, appeals from the district court's judgment of dismissal entered pursuant to a verdict in favor of the defendants-appellees, St. Elizabeth Community Health Center, a hospital located in Lincoln, Nebraska, Orlando G. Bare, M.D., a general practitioner, and Joseph R. Gard, M.D., a cardiologist. The personal representative assigns a number of errors, including that the district court erred in its charge to the jury by refusing, on the one hand, to include certain instructions the personal representative requested and, on the other, by including certain improper instructions. That assignment having merit, we reverse the district court's judgment and remand for a new trial without consideration of the remaining assignments, which present issues unlikely to occur upon retrial.

II. FACTS
Decedent, who was 64 years of age at the time, was admitted to the hospital on August 14, 1983, at approximately 1 a.m. because after she and her husband had retired to bed that night, she became lethargic, made slow and inappropriate responses, experienced weakness in her left side, was unable to move her left leg, and eventually became unable to be aroused. Bare, who was on hospital rotation for the medical group with which he practiced at the time decedent was admitted, became decedent's primary care physician.
He initially diagnosed decedent as having suffered a transient ischemic attack, or "TIA," which "means that some part of the brain's central nervous system is temporarily deprived of a blood supply and that can cause symptoms" which will normally diminish within a 24-hour period. He also determined that decedent had a history of "atrial fibrillation," an abnormality in the rhythm of the heart which creates a danger of blood clot formation. Bare sought the consultations of David Smith, M.D., a neurologist, for decedent's neurological condition and of Gard for decedent's heart condition.
The physicians concluded that decedent had suffered a stroke caused by an embolus of cardiac origin, rather than a TIA. At trial, the experts generally agreed that the embolus which caused decedent's stroke was produced by her atrial fibrillation. An embolic stroke occurs when an embolus, that is, a blood clot originating in a part of the body other than the brain, usually the heart, is transmitted to the brain, where it lodges in a blood vessel and severs the blood supply and thus the oxygen supply to that area of the brain, which as a result atrophies and dies. The area of the brain which dies is called an infarction. The physicians concluded that decedent did not suffer from a hemorrhagic stroke, which occurs when one of the blood vessels of the brain ruptures and a hemorrhage, or bleeding, results.
After consulting with Smith and Gard, Bare decided to anticoagulate decedent's blood, using two drugs, heparin and Coumadin. Anticoagulation therapy is used when a patient has suffered an embolic stroke so as to prevent further clots from developing and to prevent the release of clots which have already formed. Heparin reduces the clotting factor of blood, thus increasing the time it takes for blood to clot, but does not dissolve clots which have already formed. The use of heparin is inappropriate where a patient has suffered a hemorrhagic stroke because heparin may aggravate the bleeding.
According to Bare, Smith informed him that "there was a three-percent chance that using systemic anticoagulation Heparin therapy could exacerbate [decedent's condition] and turn it into a hemorrhagic [event, but that there was a] 14-percent risk ... that if ... she were not anticoagulated that within two weeks she would throw another clot to the brain." Bare discussed these risks with decedent and her family on the evening of August 16 and recommended the anticoagulation therapy.
*298 The primary test used to monitor the dosage of heparin given to a patient is the partial thromboplastin time level, or "PTT," which determines the number of seconds it takes for the blood to clot. Prior to initiating the anticoagulation therapy, Bare determined that decedent's PTT values and blood count were normal, that she had an adequate number of platelets, and that she had no history of a bleeding problem. Several PTT's done prior to the initiation of the anticoagulation therapy revealed that decedent's blood took between 20 to 25 seconds to clot, and the desired therapeutic level of anticoagulation was between 40 to 50 seconds.
On August 17, Bare prescribed for decedent a 5,000-unit injection of heparin, to be followed by 25,000 units of heparin infused intravenously at the rate of 1,200 units per hour, and 10 milligrams of Coumadin by mouth. Bare further ordered that a PTT test be done on decedent's blood at 4 o'clock that afternoon and that the result of the test be called to him. The nurse on duty at the time gave decedent the 5,000-unit injection at around 12 o'clock noon and then started the intravenous infusion. The hospital laboratory withdrew blood from decedent at 4:05 p.m. and called the results of the PTT test to the nurses' station at 5:30 p.m. The test indicated that decedent's PTT was greater than 200 seconds, meaning that decedent's blood took longer than 200 seconds to clot.
The nurse then on duty, Cynthia Stewart, telephoned Bare's answering service at 5:30 p.m. in order to convey the PTT result, which Stewart recognized to have "an alert value," and left a message for Bare to return her call. Stewart testified that it was her practice to report anything of significance to the physicians who were caring for the patient. According to Bare, he was in an emergency situation at another hospital all day and into the night, and although he had a beeper with him, he was never contacted by his answering service in regard to Stewart's 5:30 p.m. call.
Decedent had been experiencing a headache throughout the day and was given aspirin per Bare's order. At 6:43 p.m., decedent's heart experienced 6 seconds of atrial beats with no ventricular response. Stewart went to decedent's room, where she found decedent sitting on the side of her bed, vomiting but alert, and her skin was warm and dry. Decedent's pulse rate and blood pressure were a little elevated.
Stewart telephoned Gard at 6:50 p.m. and informed him about the heart problem. Stewart testified that although she could not remember what else she may have told Gard, her standard practice would have been to report decedent's vomiting and headache and the results of the PTT test. According to Gard, Stewart mentioned only that the laboratory had reported the PTT result and that she was waiting for Bare to return her telephone call, to which information Gard responded that Bare was the proper physician to notify concerning the PTT result. Gard further stated that he told Stewart to call him back if anything else of concern occurred. As the result of the telephone call, Gard thought that perhaps one of the heart medications decedent was taking was causing the nausea and ordered that her blood be tested to determine the amount of the medication present.
At 6:55 p.m., decedent said that she was no longer nauseated; at 7:15 p.m., she was resting in bed with her eyes closed, her color was good, and her skin was warm and dry; and at 8 p.m., she continued to rest and denied any complaints except "pain across the eyes that has been there all day."
At 8:10 p.m., Bare telephoned Stewart to determine decedent's condition. Again, Stewart could not remember what she told Bare, but testified that if she followed her standard practice, she would have informed Bare about the PTT result received at 5:30 p.m. and decedent's headache and vomiting. According to Bare, Stewart did not inform him about the PTT result during this conversation. Bare ordered that the heparin infusion be decreased to 1,000 units per hour, that the aspirin be discontinued, and that decedent be given Tylenol as needed. Bare stated that he decreased the rate of heparin infusion because he had planned to taper the heparin sometime during the day *299 and because it was possible the heparin was causing decedent's headache.
At 8:30 p.m., decedent again vomited and experienced a fast heart rate, but her skin remained warm and dry and her color pink. Stewart telephoned Bare, who ordered a medication for decedent's nausea and told Stewart to call a Dr. Forker, one of Gard's partners. Forker ordered that the level of Quinidex in decedent's blood be determined. Although Stewart gave decedent the antinausea medication at 9 p.m., decedent again vomited at 9:15.
Decedent apparently then rested until 11:20 p.m., when she again vomited, was unable to sit up on her own, and became lethargic, although she could nod her head in response to questions. Her right hand grasp was stronger than that of her left hand, and she was able to move her arms and legs only minimally. Her pupils, however, reacted quickly to light. Stewart telephoned Bare, who ordered Stewart to discontinue the infusion of heparin, to keep a close watch on decedent, and if decedent's condition worsened, to remove her to the intensive care unit and notify Gard. According to Bare, it was during this telephone conversation that he was first made aware of the results of the PTT test.
At 11:45 p.m., decedent would not respond when called, again vomited, was able to move her right hand to her mouth, and could not follow a command to squeeze the nurse's hand or nod, and although her left eye was still able to react to light, her right eye reacted sluggishly. Stewart removed decedent to the intensive care unit and telephoned Forker and Bare. At 2:30 a.m., decedent's PTT value was back down to 27 seconds. Decedent lapsed into a semicomatose state and died on May 16, 1985. A scan of decedent's brain revealed that decedent had suffered a massive cerebral hemorrhage. Decedent's death certificate recites that she died because of "cardiorespiratory arrest, as a result of pneumonia, as a result of a cerebral vascular accident several months previous."
The personal representative presented the expert testimony of three witnesses, Ralph Lazzara, M.D., a cardiologist and internist who does not practice in Nebraska, Loren Jacobsen, M.D., a general practitioner who practices in Nebraska, and Ardith Ryberg, a registered critical care nurse.
Lazzara testified that the standard of care for prescribing, administering, and monitoring anticoagulation therapy is uniform throughout the United States. He stated that a PTT greater than 200 seconds is "grossly outside" the therapeutic range and placed decedent at risk of bleeding. According to Lazzara, decedent's brain hemorrhage probably began in the afternoon hours of August 17. Lazzara opined that the "abnormal laboratory factor indicated a severe difficulty with blood clotting which did contribute to the hemorrhage that she had in her brain" and that the continued infusion of heparin after 5:30 p.m. "caused and/or contributed to the brain hemorrhage." According to Lazzara, small emboli, which he opined decedent had, rarely produce significant hemorrhage absent anticoagulation therapy.
According to Lazzara, the nursing staff at the hospital deviated from the standard of care, in the process of giving anticoagulation therapy to decedent, "in the failure to assure that the physician was informed in a timely fashion of an alarmingly abnormal level of the blood test." Lazzara further opined that assuming Gard was informed of decedent's PTT result at 6:50 p.m., Gard breached the standard of care by failing to confirm that the information was transmitted to a physician who would take care of the situation or, if not, to handle the situation himself. Lazzara stated that Bare should have actively sought the result of the PTT test if not relayed to him in a reasonable amount of time, that at least at 8:10 p.m. he should have asked the nurse for the results, and that upon hearing the results, he should have discontinued the heparin infusion. Lazzara opined that Bare breached the standard of care by failing to react at 8:30 p.m. to decedent's symptoms of vomiting, worsening headache, prior preexisting cerebral vascular problem, and the elevated PTT value. According to Lazzara, the negligence of *300 the nursing staff, Gard, and Bare each "caused and/or contributed to the brain hemorrhage."
Lazzara, however, stated that the dosage of heparin given decedent was appropriate, that he did not disagree with the decision to anticoagulate her, and that even if decedent had not been given heparin, it was possible she could have suffered a cerebral hemorrhage as a result of the embolus in her brain.
Jacobsen testified similarly to Lazzara that the nursing staff breached the standard of care by failing to more quickly alert the physicians about the PTT result. He was of the opinion that Bare did not fall below the appropriate standard by failing to call for the results of the PTT, but that Bare should have placed himself in a position to be notified. Jacobsen further stated that the failure to terminate the heparin before 6:50 p.m. "exacerbated the hemorrhagic event"; that there was "a possibility" that if the heparin had been discontinued before 6:50 p.m., "the outcome [would] have been different"; and that "the sooner you stop the Heparin, the more likely she is to recover." Jacobsen admitted, however, that there exists less than a 5-percent chance of hemorrhage from a blood vessel rupture even absent anticoagulation therapy, and, thus, decedent's hemorrhage might have occurred even if the heparin had been discontinued at 6 p.m. and even if decedent had never been given heparin.
Ryberg testified that a PTT greater than 200 is abnormal and that in her opinion Stewart breached the standard of care by failing to notify the physician immediately of the PTT result and decedent's symptoms of vomiting, headache, and sleepiness.
The defendants also produced a number of experts. Fred J. Pettid, M.D., a family practitioner who practices in Omaha, opined that Stewart met the standard of practice expected of nurses in Lincoln, Nebraska, even assuming that she did not inform any physician about the PTT result until 8:30 p.m., because at the time Stewart received the result, decedent was in a stable condition and there was no significant neurological change in decedent until 11:20 p.m., at which time Stewart notified Bare. According to Pettid, there was "no evidence... that the Heparin was causing any bleeding difficulties" in decedent. Pettid further testified that there was evidence to indicate that decedent's blood had the ability to coagulate by 8:45 and 9 p.m., because when decedent was given certain injections at those times, she did not exhibit any bleeding problems.
Registered Nurse Janet Cuddigan testified that assuming Stewart called Bare's answering service at 5:30 p.m. and at 6:50 p.m. informed Gard of the PTT value, Stewart met the standard of care. According to Cuddigan, decedent suffered no symptoms which would indicate that she was suffering a cerebral hemorrhage until 11:20 p.m.
Depak M. Gangahar, M.D., a cardiovascular surgeon who practices in Lincoln, expressed his opinion that Gard met the standard of care because Gard's responsibility was only to monitor decedent's heart condition and medications, which he did, and was not to monitor decedent's anticoagulation therapy, which was Bare's domain. However, Gangahar admitted, when questioned by the personal representative, that the PTT result had an alert value, that it indicated a heparin overdose in decedent, and that if he were Gard, he would have advised Stewart to be certain that Bare knew about the PTT result. According to Gangahar, neither he nor anyone else could know when decedent's cerebral hemorrhage occurred, but that if the hemorrhage did occur in the afternoon or evening of August 17, the elevated PTT would not help the situation.
Benjamin Gelber, M.D., a neurosurgeon who practices in Lincoln, testified that a patient who suffers an embolic stroke may suffer hemorrhage as the result of damage to the blood vessel in which the embolism is lodged regardless of the use of anticoagulants. He agreed that anticoagulation was the appropriate treatment for decedent. He further stated that the high PTT level taken at 4:05 p.m. would be expected after giving the patient a 5,000-unit injection and then intravenous infusion and that the PTT *301 would lower to therapeutic levels with the passage of time. Although Gelber stated that if he had received a PTT result over 200 seconds, he would repeat the test at least within 4 hours, he also stated that he would not discontinue the heparin but would decrease it in order to achieve the therapeutic level. It was Gelber's opinion that the most likely cause of decedent's hemorrhage was the embolic stroke and that the heparin did not cause the hemorrhage, but Gelber did state that it was possible the heparin caused the hemorrhage and that anticoagulants can make an existing hemorrhage worse.
Eugene R. Schwenke, M.D., a family practitioner who practices in Lincoln, opined that assuming Bare was involved in an emergency situation at another hospital and that Bare was not informed of the PTT at 8:10 p.m., Bare nevertheless complied with the applicable standard of care for Lincoln or similar communities. According to Schwenke, the PTT taken at 4:05 p.m. was merely a transient value that would decrease over time and that without a progression of neurological symptoms such as lightheadedness, dizziness, numbness, speech difficulty, blurred vision, difficulty walking, changes in motor activity, drooping of the face, headache or other pain, or generalized bleeding, a physician would have no reason to believe there had been a change in decedent's condition. Schwenke testified that Bare acted appropriately in not terminating the heparin until 11:20 p.m. when decedent exhibited neurological changes and that discontinuing the heparin at 8:10 or 8:30 p.m. would have created a further risk of more embolic strokes. Schwenke opined that decedent's hemorrhage resulted from her initial stroke, that the heparin was not the cause of the hemorrhage, and that the PTT of 200 at 5:30 p.m. had "no influence on the episode at 11:20."
Gard testified that a 3- to 6-percent risk exists that hemorrhage will occur as the result of an embolic stroke regardless of whether the patient is anticoagulated. Gard opined that decedent's hemorrhage was not caused by the heparin therapy and that there exists no correlation between the use of heparin and bleeding into an embolic infarct. Bare testified that the most common complication of heparin therapy is generalized bleeding and that because there was no evidence of such, he was of the opinion that decedent's hemorrhage was not caused by the heparin therapy.
As presented in the instructions to the jury, the personal representative claimed that the hospital was negligent because of the failure of its nurses to report within a reasonable time the result of the PTT test, the episodes of vomiting, and decedent's complaints of headache to decedent's attending and consulting physicians or, if such physicians were unavailable, to other physicians on its hospital staff; that Gard was negligent in failing to properly inquire about or respond to the PTT result; and that Bare was negligent by failing to properly monitor decedent's anticoagulation therapy, to inquire about and respond to decedent's PTT result, and to make proper arrangements for another physician to handle his calls if he were unavailable.

III. ANALYSIS
As noted in part I above, the personal representative asserts the district court erred in charging the jury both by refusing to give certain instructions the personal representative requested and by giving certain instructions to which the personal representative objected.

1. Instructions Refused
While the personal representative assigns error to the refusal to give four requested instructions, his argument is limited to but two of them. Since errors assigned but not argued will not be considered, Bock v. Bank of Bellevue, 230 Neb. 908, 434 N.W.2d 310 (1989), and Neb. Ct.R. of Prac. 9 D(1)d (rev. 1989), we limit our analysis to the preexisting condition and concurring cause instructions discussed by the personal representative.
We begin that analysis by recalling that in order to establish reversible error upon a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the appellant was *302 prejudiced by the court's refusal to give the tendered instruction, (2) the tendered instruction is a correct statement of the law, and (3) the tendered instruction is warranted by the evidence. Rose v. City of Lincoln, 234 Neb. 67, 449 N.W.2d 522 (1989). All of the instructions given must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal. Crewdson v. Burlington Northern RR. Co., 234 Neb. 631, 452 N.W.2d 270 (1990); Rose v. City of Lincoln, supra.

(a) Preexisting Condition
The district court refused the request that it instruct on the effect of preexisting conditions as follows:
If you find from a preponderance of the evidence that [decedent], before, or at the time of receiving care and treatment by Defendants on August 17, 1983, was suffering from a physicial [sic] condition which pre-existed such care and treatment, and that such condition, if any, was aggravated or worsened by the professional negligence of the Defendants, or any of them, then if your verdict is for the Plaintiff, the Plaintiff is entitled to recover for the whole of the result, against such Defendant or Defendants whose negligence proximately caused or contributed to the result.
There may be no recovery, however, for any results which would normally follow from any such pre-existing condition, regardless of the negligence of any of the Defendaants [sic].
The personal representative argues that because there was evidence that heparin can make a hemorrhage worse and that the hemorrhage began during the afternoon of August 17, the defendants were negligent at least in part by failing to terminate the infusion of heparin after that time; that is, that the hemorrhage was a preexisting condition which the defendants' negligence could be found to have exacerbated.
It is true that there is evidence to support a finding that decedent's hemorrhage began on the afternoon of August 17, that Stewart was negligent after that time in failing to report decedent's symptoms and elevated PTT level to the physicians, and that Gard and Bare were negligent after that time in failing to discover the elevated PTT level and terminate the heparin. It is also true that there is evidence that heparin can make an existing hemorrhage worse. However, there was not sufficient evidence on which a jury could base the conclusion that decedent would not have lapsed into a coma and died if the hemorrhage had been discovered and the infusion of heparin immediately terminated. Jacobsen stated that there was "a possibility" that if the heparin had been discontinued before 6:50 p.m., "the outcome [would] have been different," and that the sooner the heparin was discontinued, the more likely decedent was to recover. Such testimony is merely speculative. Thus, the requested instruction was not warranted by the evidence.

(b) Concurring Cause
The personal representative next contends that because the case involved multiple defendants, the district court erred in refusing to instruct as follows:
Where the independent acts or omissions to act of two or more persons combine to proximately cause an injury indivisible in its nature, each such act or omission to act is itself a proximate or concurrent cause, and any one or more of such persons may be held responsible for the entire injury. This is true even though one may have been more negligent than the other. It is no defense that all those who might have been held responsible are not made parties to this action.
This contention is also without merit, for the district court otherwise instructed the jury concerning concurring causes, using an instruction almost identical to the one the personal representative requested. It is not error on the part of a trial court to refuse to give a requested instruction if the substance of the request is contained in the *303 instructions actually given. Cassio v. Creighton University, 233 Neb. 160, 446 N.W.2d 704 (1989). While the instruction given does not specify that the independent acts or omissions which combine must be negligent acts or omissions, it is nevertheless a correct statement of the law when read in conjunction with the instruction which informed the jury that in order for the plaintiff to recover against any one of the defendants, the plaintiff must prove the negligence of that defendant. See, London v. Stewart, 221 Neb. 265, 376 N.W.2d 553 (1985); Maloney v. Kaminski, 220 Neb. 55, 368 N.W.2d 447 (1985).

2. Instructions Given
We thus move on to a consideration of the personal representative's quarrels with the instructions given. The applicable rule is that in order to establish reversible error upon a court's giving of a certain instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. Rose v. City of Lincoln, 234 Neb. 67, 449 N.W.2d 522 (1989).

(a) Standard of Care
The first challenge is lodged against the instruction dealing with the standard of care applicable to physicians, reading as follows:
Evidence of other physicians that they would have followed a different course of treatment than that followed by the defendants, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. Proof of a difference in judgment cannot amount to a proof of malpractice or medical negligence since such differences of opinion are consistent with the exercise of due care, or even the highest degree of care. The standard is set by the learning, skill and care ordinarily possessed and practiced by others of the same profession in good standing in the area of Lincoln or similar communities at that time.
We have considered the propriety of similar instructions in three other medical malpractice cases. In the oldest case, Greenberg v. Bishop Clarkson Memorial Hospital, 201 Neb. 215, 266 N.W.2d 902 (1978), the plaintiff claimed that the giving of the following instruction was erroneous:
"The testimony of other physicians that they would have followed a different course of treatment than that followed by the defendant ... or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. It is not enough merely to present the testimony of a doctor who would have acted differently, or who is willing to express the opinion that treatment should have been performed differently."
Id. at 221, 266 N.W.2d at 907.
This court agreed with the plaintiff that the questioned instruction, numbered 16, was prejudicially erroneous, explaining:
Instruction No. 16 is taken directly from Kortus v. Jensen, 195 Neb. 261, 237 N.W.2d 845 [1976]. In the context of the Kortus case the statement of law was correct, but in the context of the present case it is inapplicable and misleading. In the Kortus case there was a directed verdict in favor of the defendant doctor which this court affirmed because the evidence failed to establish the generally accepted and recognized standard of medical care and skill in the particular community, and failed to show that the defendant doctor negligently departed from that standard, other than to show that his technique differed from that of plaintiff's doctor.... It is apparent that statements of law applicable in a case in which the evidence fails to establish a prima facie case for submission to a jury are ordinarily inappropriate as instructions in a case in which a prima facie case has been established and the issues are to be submitted to a jury. The statements of law contained in instruction No. 16 are not applicable where there is ample medical testimony as to the acceptable medical standard in the community, and are incomplete in any event.
The District Court had instructed the jury as to the duty of the defendants to *304 use reasonable care and the standard of reasonable care in Omaha or similar communities, as well as instructing upon the burden of proof resting on the plaintiff. Those instructions were followed by instruction No. 16. The plaintiff's evidence of negligence was largely the testimony of doctors that they would have acted differently than the defendant doctor, or that the treatment by the defendant doctor should have been performed differently. Instruction No. 16, in practical effect, permitted the jury to infer that such testimony did not establish negligence and was not enough to establish the plaintiff's case.
201 Neb. at 221-22, 266 N.W.2d at 907.
In the next case, Watson v. McNamara, 229 Neb. 1, 424 N.W.2d 611 (1988), we agreed with the plaintiff that the following instruction was prejudicially erroneous:
"An Obstetrician-Gynecologist is not bound to use any particular method of diagnosis or treatment, and if, among Obstetrician-Gynecologists of ordinary skill and learning, more than one method of diagnosis or treatment is recognized as proper, it is not negligence for an Obstetrician-Gynecologist to adopt any of such methods. The fact that some other method of diagnosis or treatment existed, or the fact that some other specialist testified in this case that he might or would have used or advised another of a different method, does not, standing alone, establish that the defendant made or gave improper diagnosis or treatment; nor would it be an act of negligence or impropriety for the defendant not to have adopted another method."
Id. at 2, 424 N.W.2d at 612. We determined that the plaintiff had established a prima facie case of negligence. Following Greenberg v. Bishop Clarkson Memorial Hospital, supra, we stated:
Certainly a physician is not liable for malpractice in choosing one of two or more recognized methods of diagnosis or treatment, so long as the method chosen conforms with the standard of care. We believe, however, that [the instruction at issue] permitted the jury to infer that the plaintiff's experts' testimony, even if believed, did not establish negligence and was not enough to establish the plaintiff's case.
Watson v. McNamara, supra at 2-3, 424 N.W.2d at 612.
In the most recent case, Ourada v. Cochran, 234 Neb. 63, 449 N.W.2d 211 (1989), we determined, for the reasons explicated in Watson v. McNamara, supra, that the giving of the following instruction was erroneous:
"A physician who is a specialist is not bound to use any particular method of procedure; and if, among physicians of ordinary skill and learning in that specialty, more than one method of procedure is recognized as proper, it is not negligence for a physician to adopt any of such methods. The fact that some other method of procedure existed, or the fact that some other physician in that specialty testified in this case that he might or would have used or advised another or a different method, does not, standing alone, establish that the specialist used an improper procedure; nor would it be an act of negligence or impropriety for the specialist not to have adopted another method."
Ourada v. Cochran, supra at 66, 449 N.W.2d at 213-14.
So, too, in this case is the questioned standard of care instruction prejudicially erroneous. It misleads the jury into concluding that the expert testimony of physicians that a different course of treatment should have been followed fails to establish negligence. The reality is that such testimony may or may not establish negligence; it does if the different course would have been followed because the course actually employed failed to meet the required standard, but does not if the course actually employed was one of several which met the required standard.
Thus, we must determine at this point in our analysis that the district court did, as claimed by the personal representative, err in including in its jury charge a prejudicially erroneous instruction, to which he had *305 objected. While that resolves the first assignment of error, we nonetheless consider the remaining issue it presents, as it is likely to resurface in any retrial of this case.

(b) Cumulative Instructions
The personal representative's additional claim of error in the charge to the jury is predicated on the giving of three instructions. He claims these instructions are repetitious of each other as well as of other instructions concerning a physician's standard of care and thereby unduly emphasize the burden of proof placed upon him.
The first of the instructions challenged as repetitious is the standard of care instruction included in the district court's jury charge set forth in part III(2)(a) above.
The second informed the jury:
The law does not require of a doctor or nurse absolute accuracy either in their practice or judgment. It does not hold them to the standard of infallibility or make them an insurer of the safety or well being of their patient or require of them the utmost degree of skill known to their profession. It requires of them that in the practice of their profession or specialty they shall exercise that degree of care, skill and learning ordinarily possessed and used by members of their profession or specialty in the general locality in which they practice, or in similar localities.
And the third advised the jury:
In determining whether the learning, skill and conduct of the defendants fulfilled the duties imposed on them by law, as they have been stated to you in these instructions, you are not permitted to set up an arbitrary standard of your own. The standard is set by the learning, skill and care ordinarily possessed and practiced by others of the same profession in good standing in Lincoln, Nebraska, or similar communities at the same time.
The foregoing instructions were given in addition to two other instructions which set forth the standard of care of health care providers. One of these other instructions reads, in part:
By negligence in this lawsuit, with regard to the defendant physicians, is meant the doing of some act or the failure to do some act under the circumstances present which violates the standard of reasonable and ordinary care, skill and knowledge in Lincoln, Nebraska, or in similar communities.
In determining what constitutes reasonable and ordinary care, skill and diligence on the part of the doctor in a particular community, the test is that which physicians in the same community and in similar communities engaged in the same or similar lines of work would ordinarily exercise for the benefit of their patients.
By negligence in this lawsuit in regard to the defendant Saint Elizabeth Community Health Center is meant the doing of some act or the failure to do some act under the circumstances present which violates the standard of reasonable and ordinary care, skill and knowledge of hospital personnel in Lincoln, Nebraska, or similar communities.
The other instruction declares in part:
In performing professional services, a doctor must use the care, skill and knowledge ordinarily possessed and used under like circumstances by physicians in good standing in his or similar localities. In the application of this knowledge and skill, the doctor must also use reasonable care.
In performing professional services, a doctor who is a specialist must use the skill and knowledge ordinarily possessed and used under like circumstances by members of his specialty in good standing in his or similar localities. In the application of this knowledge and skill the doctor must also use reasonable care.
In mounting his attack on the repetitious nature of these standard of care instructions, the personal representative relies upon Watson v. McNamara, 229 Neb. 1, 424 N.W.2d 611 (1988), in which the plaintiff contended that the six standard of care instructions used in that case unduly emphasized *306 the limitations on the physician's liability and misled the jury. We stated:
After the standard of care was given in [one] instruction ... it was repeated in one form or another in the instructions that followed, no less than five times. These instructions also recited an exhaustive litany of physician immunities. We have said that it is not reversible error for the trial court to repeat a proposition of law in the instructions in proper connection with facts or other principles involved or if it does not appear that the effect was to confuse or mislead the jury. Kaspar v. Schack, 195 Neb. 215, 237 N.W.2d 414 (1976). It is also true that each of these instructions, save [one], standing alone, correctly stated the law. Id. These maxims notwithstanding, we believe that the applicable standard is that where instructions, considered in toto, so repetitiously cover a point of law or its application as to grossly overstate its effect on one side to the explicit detriment of the other side, it is error. Samuelson v. Freeman, 75 Wash.2d 894, 454 P.2d 406 (1969).
229 Neb. at 3, 424 N.W.2d at 612-13.
We conclude that the three challenged instructions, when combined with the other standard of care instructions given, so repetitiously emphasized the point that health care providers are not to be held to an arbitrary standard or one of infallibility as to overstate the point's effect and thereby confuse and mislead the jury.

IV. DECISION
The judgment of the district court is reversed and the cause remanded for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
HASTINGS, C.J., not participating.