STATE OF NEBRASKA, APPELLEE, V. DANNY B. JOHNSON, APPELLANT.
464 N.W.2d 167

Filed January 4, 1991. No. 89-1212.

Chris M. Arps, of Arps & Schirber Law Offices, for appellant.

Robert M. Spire, Attorney General, and Elaine A. Catlin for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Following a jury trial, defendant, Danny B. Johnson, was convicted of burglary, a Class III felony, in violation of Neb. Rev. Stat. § 28-507 (Reissue 1989). He was sentenced to a term with the Nebraska Department of Correctional Services for 18 months to 3 years.

The defendant has appealed, assigning as error (1) the insufficiency of the evidence, (2) the admission of hearsay statements, (3) the admission of statements made by defendant's wife in violation of the spousal privilege, (4) the giving of certain instructions, and (5) the excessiveness of the sentence. We affirm.

During the nighttime hours of February 12, 1989, Bellevue Transmission, located in Bellevue, Nebraska, was broken into

and two vending machines containing candy, nuts, and coins were removed from the premises. Investigating officers found one broken-out window and one cut-out window through which access to the building could be had.

There had been a fresh snow that night, and the officers found two sets of footprints outside the building. One set of prints was made by hiking boots of the "wafflestomper" variety, and another set was made by rubber hunting or fishing boots. One of the officers followed these two sets of tracks, which paralleled each other. In the vicinity of a shed located at 2105 Fairview were impressions in the snow made by objects which the police officer said matched exhibits 11 and 13, a vending machine and a stand that were two of the items removed from Bellevue Transmission. The footprints were followed to the address of 2104 Tulip Lane. Matching footprints were then discovered leading from 2104 Tulip back to the scene of the break-in.

Police officers of the Bellevue Police Department then made contact with the people living at 2104 Tulip and were admitted to the house. Officer Monnier, who had been the officer following the tracks, noticed a pair of rubber boots standing by the door. He picked up one of the boots, and he looked at the print of the sole and visually matched it with one of the set of prints which he had followed. The boots appeared wet. Monnier asked to whom the boots belonged, and the defendant admitted they were his. Both the defendant and his brother Randy said there were no other boots in the house. The officers asked defendant for permission to look around the house, and it was denied. A decision was made by the officers to obtain a search warrant and to leave two officers at the residence to provide security.

The police checked with their communication center and discovered an outstanding felony warrant on defendant's brother Randy. While the officers were waiting for the search warrant, the defendant and his brother exited the premises fully dressed, wearing winter outerwear, and Randy was placed under arrest on the felony warrant. The defendant then "hurried" back into the house. During the wait for the warrant, Officer Monnier continued to monitor the premises from the

outside and noticed lights being turned off and the defendant peeking out. The officers heard the clanging of what sounded like change hitting the floor in the garage.

Eventually, Officer Strachota appeared with the search warrant, and the officers knocked at the west door. It was a couple of minutes before anyone showed up to let them in. Strachota searched the residence while Monnier visited with the defendant's wife, Belinda Johnson. Over the objection of "hearsay, in violation of 27-505," Monnier was permitted to testify as to what Mrs. Johnson finally told him. Monnier's answer was that

> [s]he told me that Randy, who had been staying with Belinda and Danny at the house there, had left the residence that evening, approximately 8 p.m., and a short time later returned. And at that time Randy got Danny, left the residence with intentions of committing a burglary near Philadelphia Place.

In the meantime, Officer Strachota found a number of quarters inside the garage and also found some wafflestomper boots hidden behind a partition near the water heater. Monnier and Strachota, followed by defendant's wife, went into the upper level of the house.

Officer Strachota testified to finding $12.50 worth of coins in the garage. He also told about finding the hiking boots, which he said were "real wet." He also testified to finding the vending machines upstairs and some nuts from one of the vending machines. In connection with the description of the nuts, Strachota was asked what Mrs. Johnson said about them, but an objection as to hearsay was sustained. The State then made the following offer of proof:

> State would make an offer of proof that if allowed to answer, the witness would testify that she stated that the peanuts were taken in the burglary. And the State's offered them, she's unavailable to me as a witness because of a spousal privilege. And given the fact that she knows everything in the burglary, it exposes her to criminal liability, so it's an exception to the hearsay rule for being in possession of stolen goods.

Following argument outside the presence of the jury, the trial

court changed its ruling and overruled the hearsay objection, allowing testimony that Mrs. Johnson said to the officer that the peanuts were removed from the vending machine.

Strachota further testified that later in the morning, Cheryl Bland, the mother of defendant's wife, called him, which caused him to return to the premises. Bland then showed him a stand for one of the stolen vending machines and a blue peanut-vending machine, both of which had been hidden behind a couch. Following additional conversation with Bland, Strachota found some quarters and the stand for the other vending machines. The stand was found underneath the downstairs kitchen table, and the quarters were found wrapped in a towel on a counter in the downstairs kitchen.

As part of the defense, defendant's brother Randy testified that he committed the burglary by himself. He admitted that he was wearing mountain boots, or wafflestompers. He said that following the break-in, he took two vending machines and carried them to Taco John's. This was approximately 400 feet to the north. He said that he thought he made two trips from the scene of the burglary to Taco John's because there were two machines. He then carried one of the vending machines to the defendant's house, changed boots, and went back to get the other vending machine.

Randy denied that his brother, the defendant, had anything to do with the burglary. The witness further said that he took the peanuts out of the machine and put them in a bowl and that he took the money and wrapped it in a rag in the kitchen. He stated that he took the stands off the machines, taking one off in the kitchen and one off in the garage.

Defendant's wife testified that her husband had been home all evening. However, she also said that she and her husband did not sleep in the same room that night. She assumed he was in bed all that time until she heard a noise and came out into the hallway. According to a statement which she had given in her own handwriting to the police, she was awakened by a noise, came out into the hallway, and was asked by Randy and Danny to go back to bed. She said that she did not see anything, but that later the police came to the door and asked questions of Randy, Danny, and her and then came back with a search

warrant.

Mrs. Johnson testified that although she wrote the statement herself, the facts stated therein were not true. However, according to her testimony on redirect examination, apparently the only thing that was incorrect about the statement was that Randy would never have told her to go back to bed or she "probably would have decked him." She did admit that she came out into the hall where Randy and Danny were located after hearing a noise and then went back to bed, following which time the police came, left to get a search warrant, and returned.

The defendant, in his testimony, said that his wife went to bed and then he went to bed and that his brother Randy was still at the house. He mentioned hearing the noise and said that Randy told him that he had fallen down. The defendant then testified that he told his wife to go back to bed; that he saw some lights flashing; and that he saw some police officers on his driveway, one of whom waved to him to come outside, which he did. The officers talked to the defendant about a burglary and also talked to his brother Randy. They asked permission to search the house, which request the defendant denied, he said, because he was confused. Defendant went on to testify that the police officers told his brother they were investigating a burglary and that some footprints led to the house, that the officers asked Randy if he knew anything about the burglary, and that Randy said no. Defendant also testified that the officers saw his rubber snow boots where he had left them by the front door, picked them up and looked at the bottoms, and then set them back down. Although the boots actually belonged to Randy, the defendant told the officers they were his. Defendant stated that he had used the boots that night. Contrary to the testimony of the police officers, the defendant testified that only his brother left the house while the officers were getting the search warrant and that his brother was immediately arrested on a Douglas County warrant.

There was further testimony from the defendant that the officers returned with a search warrant and that later he was arrested for burglary.

On rebuttal, Officer Monnier testified that at one point in

time when he was in the Johnson house, he found the defendant's wife in her bedroom, curled up in a fetal position, complaining that her stomach hurt. He asked her if she was all right, and according to Monnier, she stated that "her stomach hurt so bad from worrying about the stress of what Danny and Randy had done." A defense objection of relevancy, hearsay, foundation, and improper rebuttal was overruled.

At the conclusion of all of the evidence, a defense motion for a directed verdict was overruled. The jury returned a verdict of guilty.

Regarding the first assignment of error—the insufficiency of the evidence—a verdict in a criminal case will not be disturbed on appeal if the evidence, viewed most favorably to the State, is sufficient to support that verdict. *State v. Thomas, ante* p. 568, 462 N.W.2d 618 (1990); *State v. Williamson,* 235 Neb. 960, 458 N.W.2d 236 (1990). In determining the sufficiency of the evidence to sustain a conviction, it is not the province of the Supreme Court to resolve conflicts in evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the fact finder. *State v. Thomas, supra*; *State v. Saltzman,* 235 Neb. 964, 458 N.W.2d 239 (1990).

The evidence of the two sets of distinctive footprints is practically irrefutable. They were followed from the scene of the burglary, through the Village Inn parking lot between the Village Inn and the Best Western Motel, to the south end of Taco John's, and eventually to the residence of the defendant. The prints matched the two pairs of boots found at the defendant's residence, one pair of which the defendant said he had worn the evening of the burglary while clearing snow from his driveway, although they belonged to his brother Randy. Although the brother testified that he had carried the two vending machines to Taco John's and then had carried one home, had changed boots, and had gone back to Taco John's to pick up the second machine, this testimony the jury apparently found not believable. He could not possibly have made the second set of tracks from the scene of the burglary to Taco John's because he did not go back to the scene after supposedly changing his boots. Also, he testified that he had made two trips

from the burglary scene to Taco John's, but this would have been before he allegedly changed his boots, and the two distinctive sets of prints were found between the burglary scene and Taco John's.

Furthermore, the fruits of the crime were found in various places throughout defendant's house. Defendant's so-called alibi—that his wife saw him go to bed at the same time that she did—was refuted in part by her own testimony and that of the defendant. The defendant testified that he went to bed after his wife did and that his brother was still in the house. When Mrs. Johnson was awakened by some noise, she went out into the hall and both her husband and his brother were there, and she was told to go back to bed, which she did. It was after this that the police showed up for the first time to interview the two brothers.

One of the police officers testified that while awaiting the arrival of the search warrant, both the defendant and his brother came out of the house—in an obvious effort to escape. This was denied by the defendant, but it made for a legitimate question of fact.

Certainly, there was sufficient evidence, if believed, for a jury to have found the defendant guilty. There is no merit to the first assignment of error.

Defendant's second and third assignments of error relate to the testimony of Officers Strachota and Monnier as to two different statements made to them by the defendant's wife, which it is claimed violated both the hearsay rule and the spousal immunity rule. Because the assigned errors are interrelated, they will be considered together. As previously stated, one statement was that Mrs. Johnson said that defendant and his brother left the house with the intention of committing a burglary. The other statement related to some nuts that were found in a bowl in the cupboard, and the officer claimed that Mrs. Johnson said that they were removed from one of the vending machines.

The first statement was objected to as hearsay and "in violation of 27-505." The second statement was objected to on the grounds of hearsay.

However, Neb. Rev. Stat. § 27-804 (Reissue 1989) provides

as follows:

> (2) Subject to the provisions of section 27-403, the following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (c) A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.

Section 27-804(1) provides: "Unavailability as a witness includes situations in which the declarant: (a) Is exempted by ruling of the judge on the ground of privilege from testifying concerning the subject matter of his statement . . . ."

Neb. Rev. Stat. § 27-505 (Reissue 1989) provides in part as follows: "(2) During the existence of the marriage, a husband and wife can in no criminal case be a witness against the other. This privilege may be waived only with the consent of both spouses."

The testimony proscribed by § 27-505 would tend to incriminate the defendant, and therefore his wife could not be a witness against him without the consent of both her and her husband. During a sidebar conference before the statement relating to the peanuts was sought to be elicited, the court inquired of defense counsel if the defendant and his wife were consenting to her testimony, and he replied, "No, of course not."

As a general rule, the exercise of a privilege not to testify renders the witness unavailable to the extent of the scope of the privilege. See McCormick On Evidence § 253 (E. Cleary 3d ed. 1984). Ordinarily, it is necessary for the party seeking to invoke the privilege exception to the hearsay rule to first call the witness and ask the questions, thereby compelling the spouse to make a formal claim of privilege. *Commonwealth v. DiPietro*, 4 Mass. App. 845, 356 N.E.2d 269 (1976). This would seem to require in most instances that the proponent of the hearsay statement make a reasonable effort to determine that the witness will claim the privilege. See *State v. Jordan*, 229 Neb. 563, 427

N.W.2d 796 (1988).

However, where, as here, the court asked defendant's counsel if the privilege would be waived and received a negative answer, it was not necessary for the State to go through the formalities of actually calling the witness in this instance. Therefore, in our judgment the State had established the unavailability of the witness.

It is then necessary for us to determine whether the alleged statements were made against the witness' pecuniary interest.

The State argues that because she knew that her statements would implicate her husband, possibly causing him to be sentenced to a term of imprisonment, his unavailability to work and provide income for her and her family would be against her pecuniary interest. No authority is cited in support of this proposition, and we have been unable to find any. This contention is without merit.

As to the claim that the statements would subject the witness, Mrs. Johnson, to criminal liability, we find it unnecessary to decide. Assuming, without deciding, that the statements violated the hearsay rule and should not have been admitted, we find that the remaining evidence of defendant's guilt was so overwhelming that the admission of such statements was harmless beyond a reasonable doubt. *State v. Baltimore, ante* p. 736, 463 N.W.2d 808 (1990).

The fourth assignment of error relates to the court's jury instructions Nos. 3 and 10. However, it is obvious from reading the instructions and from the defendant's argument that he is referring to instruction No. 9 rather than instruction No. 10.

Instruction No. 3 is as follows:

Regarding the charge of burglary, the elements of the State's case are:

(1) The defendant broke and entered, or aided and abetted in such breaking and entering, property at 304 Galvin Road North in Bellevue, Nebraska;

(2) That such breaking and entering was done willfully, maliciously, and forcibly;

(3) That it was done with the intent to steal property or commit some other felony while within the structure;

(4) The act took place on or about February 12, 1989;

and

(5) The act took place in Sarpy County, Nebraska.

If you decide that the state proved each element beyond a reasonable doubt then you must find the defendant guilty. Otherwise, you must find the defendant not guilty.

Instruction No. 9 is as follows:

The defendant can be guilty of the crime charged even though he personally did not commit every act involved in the crime so long as he aided someone else to commit it. The defendant aided someone else if:

(1) the defendant in some way intentionally encouraged or helped another person to commit the crime; and

(2) the defendant knew that the other person intended to commit the crime; and

(3) the crime in fact was committed by that other person.

The state must prove beyond a reasonable doubt that the crime was committed <u>and</u> that the defendant either personally did all the acts necessary to commit it or aided someone else to commit it.

(Emphasis in original.)

Section 28-507 defines burglary as follows: "(1) A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value. (2) Burglary is a Class III felony."

It is apparent that instruction No. 3 correctly defines the elements of burglary. The defendant does not contend the contrary, but argues that by the insertion of a reference to the words "aided and abetted," the jury would be confused as to "when the aiding took place." Brief for appellant at 15. The question then becomes one as to the validity of instruction No. 9, defining aiding and abetting.

This court has consistently held:

Aiding and abetting involves some participation in the criminal act and must be evidenced by some word, act, or deed. No particular acts are necessary, nor is it necessary that any physical part in the commission of the crime is taken or that there was an express agreement therefor.

Mere encouragement or assistance is sufficient. (Citations omitted.) *State v. Bennett*, 219 Neb. 601, 606, 365 N.W.2d 423, 426-27 (1985).

A cursory reading of instruction No. 9 makes it abundantly clear that the jury was told that in order to aid another to commit a crime, the defendant must intentionally encourage another "to commit the crime" and must know that the other person "intended to commit the crime" and the "crime in fact [must be] committed by that other person." The two instructions when read together fully and fairly instructed the jury on the elements of the crime. *Denesia v. St. Elizabeth Comm. Health Ctr.*, 235 Neb. 151, 161, 454 N.W.2d 294, 302 (1990), provides: "All of the instructions given must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal."

Finally, the defendant insists that the sentence imposed upon him was excessive. It is beyond dispute that in Nebraska a sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion on the part of the sentencing court. *State v. Johnson*, 234 Neb. 110, 449 N.W.2d 232 (1989); *State v. Willett*, 233 Neb. 243, 444 N.W.2d 672 (1989).

The statutory penalty for this offense is imprisonment for not less than 1 year nor more than 20 years. It is quite apparent that the court took into account that the defendant's record was less serious than that of his brother, as the latter was sentenced to a term of 2 to 5 years, as compared to 18 months to 3 years with credit for time served before conviction, which sentence the defendant received. There was no abuse of discretion.

The judgment of the district court is affirmed.

AFFIRMED.