JEFFREY CRITCHFIELD, A MINOR, BY AND THROUGH HIS FATHER
AND NEXT FRIEND, ALAN JOE CRITCHFIELD, APPELLEE, V. LEE F.
MCNAMARA, M.D., APPELLEE, AND ARCHBISHOP BERGAN
MERCY HOSPITAL, APPELLANT.
532 N.W.2d 287

Filed May 19, 1995.   No. S-93-973.

John R. Douglas, of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

Martin E. Spellman, of Spellman, Spellman, Spellman, Spellman, Kealhofer & Spellman, and Duane M. Katz for appellee Critchfield.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

WRIGHT, J.

This medical malpractice action was commenced by Alan Joe Critchfield on behalf of his minor son, Jeffrey Critchfield. It is alleged that Jeffrey's pediatrician and the hospital at which Jeffrey was born were negligent in their care of Jeffrey at the time of his birth and that Jeffrey has suffered developmental delays as the result of this negligence. The jury was unable to reach a verdict, and a mistrial was declared. The hospital filed a motion for judgment notwithstanding the verdict, which was overruled, and the hospital has appealed.

## SCOPE OF REVIEW

On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the material and relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences which can be deduced therefrom. *Humphrey v. Nebraska Public Power Dist.*, 243 Neb. 872, 503 N.W.2d 211 (1993); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993); *Pugh v. Great Plains Ins. Co.*, 239 Neb. 171, 474 N.W.2d 677 (1991).

In order to sustain a motion for directed verdict or judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Humphrey v. Nebraska Public Power Dist., supra.*

## FACTS

Kathryn Critchfield gave birth to twins by a cesarean section performed by Lee F. McNamara, M.D., at Archbishop Bergan

Mercy Hospital (hospital) on November 23, 1984. Jeffrey was born at 7:20 a.m. The admission assessment conducted at 7:30 a.m. revealed that Jeffrey's lungs were retracting, his skin showed evidence of cyanosis and pallor, he had a weak cry, and his muscle tone was flaccid. He was admitted to the neonatal intensive care unit, where it was recorded that he was grunting and retracting and that he was pale. His birth weight was 4 pounds, 10 ounces, while his twin weighed 5 pounds, 15$\frac{1}{2}$ ounces. McNamara was the primary pediatrician for Jeffrey during his hospitalization from November 23 to December 12. At the time of Jeffrey's birth, the hospital did not have any rule or policy which required the presence of a neonatologist or other specially trained pediatrician in the delivery room in the event of a high-risk delivery. However, the hospital did have in its employ two neonatologists who maintained their offices at the hospital.

### THE PLAINTIFF'S EVIDENCE

At trial, Dr. Clark Shattuck, an obstetrician-gynecologist, testified based on his review of the records that at birth Jeffrey was a healthy baby suffering from respiratory distress syndrome, but exhibiting no evidence of brain damage. He stated that Jeffrey had mild intrauterine growth retardation, but that condition does not necessarily mean a child will be impaired. Shattuck said it was his opinion that Kathryn Critchfield's pregnancy was high risk due to the following factors: uncertainty of the due date; the lack of fetal testing, serial ultrasounds, and amniocentesis; a previous cesarean section; and a documented bleeding problem in the mother. These factors indicated that there was an extremely high probability that the smaller baby would experience respiratory distress at the time of delivery. Shattuck opined that the standard of care required that a neonatologist be present to provide care to the smaller baby from birth. In his opinion, two physicians should have been present at the delivery, and one of them should have been a neonatologist. Shattuck also stated that the hospital should have had a policy requiring a neonatologist to see a patient in Jeffrey's condition, assuming that the hospital had two neonatologists with offices in the hospital.

Dr. Ronald Gabriel, a pediatric neurologist, testified that a neurological emergency was present with respect to Jeffrey as of 7:30 a.m. on November 23, 1984, because Jeffrey suddenly experienced a lack of oxygen, probably a reduced blood flow, and almost certainly acidosis. Gabriel said that Jeffrey's brain was vulnerable to being damaged because of those conditions and that brain damage ultimately occurred. Gabriel noted that the only treatment Jeffrey received between 7:30 and 10 a.m. on November 23 was the delivery of oxygen. This therapy was inadequate because the oxygen was not delivered in a positive fashion. Gabriel stated that Jeffrey should have received ventilation and respiratory support through intubation, either endotracheal or with nasal prongs, or, at the very least, continuous positive airway pressure. This type of respiratory support would have resulted in Jeffrey receiving enough oxygen to prevent hypoxia, which in turn would have prevented brain damage. Gabriel also stated that Jeffrey should have received bicarbonate in the anticipation that he was going to be acidotic. The bicarbonate would have prevented acidosis, or diminished its impact, and reduced the impact upon the brain cells and brain fibers.

The nursing notes state that Jeffrey demonstrated lethargy at approximately 7:45 p.m. on November 23. Gabriel testified that this indicated that Jeffrey was experiencing neurological change. Beginning at 11:30 p.m., the nurses observed and recorded that Jeffrey demonstrated poor muscle tone, shallow respirations, and little movement. Between midnight and 4:30 a.m., his tone was consistently described as being poor. According to Gabriel, these findings indicated Jeffrey was neurologically abnormal. Chest retractions were recorded beginning at approximately 3:30 a.m. and continuing until about 6:30 a.m. In Gabriel's opinion, the combination of a change in Jeffrey's neurological status with the shallow respirations and retractions indicated that Jeffrey was showing clinical manifestations of acute brain damage as a consequence of lack of delivery of oxygen and probably perfusion or blood flow to the distal-most portions of the brain with respect to the arterial tree.

Gabriel testified that the nursing personnel should have reported the findings of muscle tone abnormality, lethargy, and

the presence of retractions to the attending doctor during the night of November 23 and the early morning hours of November 24. Gabriel testified that for a nurse not to bring to the attention of a physician what appeared to be a significant change in neurological condition without explanation would not be acceptable in his neonatal intensive care unit. Gabriel stated that if the neurological changes had been reported to Jeffrey's doctor, the doctor would have instituted or reinstituted measures of respiratory support to increase oxygen tension in the blood and to reverse the acidosis. Gabriel noted that no such measures were taken for Jeffrey.

Gabriel stated that Jeffrey did not have neurological impairment at the time of delivery and that any brain damage he has was sustained after his birth. According to Gabriel, it did not make sense for the hospital to have a neonatal intensive care unit for seriously or critically ill newborns and yet not have a pediatrician trained in neonatal care to supervise the unit.

Dr. Stanley Levine, a developmental pediatrician, testified that the hospital should have had a policy requiring a pediatric or neonatology consultation for Jeffrey. If Jeffrey had been properly monitored during the first day of his life, he would have received oxygen for hypoxia. Blood gases would have been monitored meticulously and corrected if necessary by means of a ventilator. Levine stated that the nursing care deviated from applicable standards in that the nurses noted that Jeffrey was having significant difficulties for prolonged periods of time on numerous occasions. Levine stated that if the nursing personnel had informed the physician of the baby's difficulties, some action could have been taken by the physician to ameliorate the brain damage. According to Levine, if the physician did not respond to the nurse's concerns, a good nurse would have contacted his or her supervisor.

Dr. Barbara Latinis–Bridges, professor of nursing at the University of Kansas, testified that the nursing care provided to Jeffrey during the first 24 hours of his life departed from applicable nursing standards in that Jeffrey needed positive pressure ventilation upon arriving at the neonatal intensive care unit. She stated that the nurses had a duty to call the physician during the evening of November 23, when Jeffrey began to

manifest further nonreassuring symptoms.

### THE DEFENDANTS' EVIDENCE

Shortly after his birth, Jeffrey was taken to the neonatal intensive care unit, where a nurse administered oxygen from 7:30 to 9:50 a.m. pursuant to the hospital's written policy prepared by Dr. Paul Byrne, a neonatologist. McNamara examined Jeffrey at 8 a.m. and ordered a chest x ray and blood tests. He examined Jeffrey again at 9:10 a.m. and reviewed the x ray and test results. At 2:30 p.m., a nurse called McNamara's office and reported Jeffrey's condition, and McNamara issued orders for additional blood gases at 6 p.m.

In McNamara's opinion, Jeffrey was intrauterine growth retarded and exhibited typical transient tachypnea of the newborn. McNamara said he would have taken no other action than that taken by the nurses. McNamara testified that it was not necessary for the nurses to call him to report their observation of poor muscle tone, and he had no criticism of the nurses for failing to call him. In his opinion, it was not necessary to intubate, ventilate, or give positive pressure air to Jeffrey. Such treatment would have been "overkill" and contraindicated, McNamara said.

In 1984, the hospital's policy required consultation before cesarean sections only in specific situations. Consultation with the Department of Pediatrics was required for infants who weighed less than 4 pounds. Dr. Richert Taylor, a board–certified obstetrician–gynecologist and chairman of the hospital's Department of Obstetrics and Gynecology, participated in the creation of the department's policies. He stated that it was the policy of the hospital for the attending physician to determine who would assist with the cesarean section and who would care for the baby.

Dr. Paul Goodrich, the only neonatologist to testify, stated that Jeffrey did not have hyaline membrane disease or classical respiratory distress syndrome and that Jeffrey should not have been treated with a ventilator or any other type of positive pressure oxygen. According to Goodrich, Jeffrey suffered from intrauterine growth retardation, and there was no evidence to suggest that anything unusual occurred at the time of birth or

during Jeffrey's hospital stay. Goodrich believed the etiology of Jeffrey's problem occurred in the uterus.

Dr. Richard Andrews, a pediatric neurologist in Omaha, opined that Jeffrey did not have respiratory distress syndrome, but, rather, a short period of respiratory distress that did not require ventilator care. Andrews stated he found nothing in the chart of Jeffrey's hospitalization that would indicate a clinical condition which could cause any type of brain injury. Dr. Bruce Buehler, a pediatrician, testified that Jeffrey's problems were caused by intrauterine growth retardation.

## ASSIGNMENTS OF ERROR

In summary, the hospital assigns as error the district court's denial of the hospital's motion for judgment notwithstanding the verdict. The hospital asserts that Jeffrey failed to offer evidence that any act or omission of the hospital was a proximate cause of any injury or damage to him.

## ANALYSIS

This appeal comes to us following the district court's overruling of the motion for judgment notwithstanding the verdict. We note first that such an order was held to be appealable in *Ditloff v. Otto*, 239 Neb. 377, 476 N.W.2d 675 (1991). In *Ditloff*, we construed Neb. Rev. Stat. § 25-1315.02 (Reissue 1989) to authorize an appeal from the denial of the judgment notwithstanding the verdict after the jury has been discharged as the result of an inability to reach a verdict.

On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the material and relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences which can be deduced therefrom. *Humphrey v. Nebraska Public Power Dist.*, 243 Neb. 872, 503 N.W.2d 211 (1993); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993); *Pugh v. Great Plains Ins. Co.*, 239 Neb. 171, 474 N.W.2d 677 (1991). In order to sustain a motion for directed verdict or judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but

one conclusion. *Humphrey v. Nebraska Public Power Dist.,* *supra.*

The hospital argues that it had no duty to intervene in the treatment provided and ordered by McNamara and no duty to require that McNamara seek a consultation with a neonatologist. In *Jensen v. Archbishop Bergan Mercy Hosp.,* 236 Neb. 1, 459 N.W.2d 178 (1990), we held that, as a general rule, hospital staff members lack authority to alter or depart from an attending physician's order for a hospital patient and lack authority to determine what is a proper course of medical treatment for a hospitalized patient. The hospital claims that since all hospital personnel followed the orders of McNamara as they related to the care of Jeffrey, it cannot be held liable for the course of treatment pursued by McNamara. McNamara testified that he was well aware of the baby's condition and that the nurses did not need to call him at night to tell him again.

The present case is distinguishable from *Jensen* because one of the allegations is that the hospital failed to timely report an abnormal change in Jeffrey's condition to responsible medical personnel. Gabriel testified that the nursing notes showing lethargy, poor muscle tone, and shallow respiration indicated that Jeffrey was neurologically abnormal and that this abnormality should have been reported to McNamara during the night of November 23 and early morning hours of November 24 so that appropriate measures could have been taken to address Jeffrey's respiratory difficulties. According to Gabriel, the hospital, via its nursing staff, had a duty to report the medically significant conditions. Latinis–Bridges testified that Jeffrey's records showed a departure from nursing standards in the first 24 hours of his life, when he needed additional blood gas tests and further treatment for acidosis. She testified that the nurses had a duty to call McNamara in the evening when Jeffrey began to manifest further nonreassuring symptoms and that it was the nurses' responsibility to let McNamara know of behaviors or lab studies which were outside the norm so that he could make a medical diagnosis. Latinis–Bridges stated that McNamara should have been called concerning two entries: at 7:45 p.m. on November 23, when Jeffrey was reported to be lethargic, and at 11:30 p.m., when shallow respiration and poor muscle tone

were noted. This data provided enough information for the nurses to understand that a physician should have been notified.

In our review of the evidence, we consider all of the relevant and material evidence which is favorable to Jeffrey, who is entitled to the benefit of all proper inferences which can be deduced from such evidence. *Humphrey v. Nebraska Public Power Dist.*, 243 Neb. 872, 503 N.W.2d 211 (1993). The evidence offered by Jeffrey establishes that the hospital should have reported the change in Jeffrey's condition to appropriate medical personnel. Gabriel testified that the hospital, via its nursing staff, had a duty to report the abnormal conditions. The question of whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *S.I. v. Cutler*, 246 Neb. 739, 523 N.W.2d 242 (1994). " ' "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." ' " *Id.* at 741, 523 N.W.2d at 244. Accord W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53 (5th ed. 1984).

It is obvious that the hospital, via its nursing staff, has a duty to report medically significant changes in the condition of a patient without delay to the treating physician or the physician in charge. Thus, if there were changes in Jeffrey's condition that were medically significant, there existed a duty on the part of the hospital to report such changes without delay. Such a requirement is basic to appropriate medical care.

The hospital next argues that its actions were not a proximate cause of Jeffrey's damages. Jeffrey must establish that the hospital's actions or inactions were a proximate cause of his brain damage. "The proximate cause of an injury is that cause which, in a natural and continuous sequence, unaccompanied by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 9, 459 N.W.2d 178, 183 (1990). The hospital states that even assuming some negligence by the nurses caring for Jeffrey, such conduct was not the proximate cause of his damages because the care given was at the direction and under the control of McNamara.

The expert testimony presented at trial as to the cause of

Jeffrey's impairment was conflicting. The evidence presented by Jeffrey showed that Jeffrey was healthy at birth and that he exhibited no evidence of brain damage. Gabriel testified that the nurses' notes stated that Jeffrey demonstrated lethargy at 7:45 p.m., which indicated that Jeffrey was experiencing neurological change. At 11:30 p.m., the nurses observed and recorded that Jeffrey demonstrated poor muscle tone, shallow respirations, and little movement. According to Gabriel, these findings indicated Jeffrey was neurologically abnormal. These changes indicated that Jeffrey was showing clinical manifestations of acute brain damage as a consequence of lack of delivery of oxygen. According to Gabriel, the nursing personnel should have reported these findings to the attending doctor, who would have instituted measures of respiratory support.

In order to sustain a motion for directed verdict or judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Humphrey v. Nebraska Public Power Dist.*, 243 Neb. 872, 503 N.W.2d 211 (1993). The medical evidence presented by Jeffrey created an issue of fact as to whether the treatment Jeffrey received or the lack of such treatment was the proximate cause of his brain damage. Having determined as a matter of law that a hospital has a duty to report medically significant changes in the condition of a patient without delay to the treating physician or the physician in charge, we find that the same evidence creates an issue of fact as to whether the hospital failed to give Jeffrey the proper care and whether such failure was the proximate cause of Jeffrey's brain damage. As the party against whom the motion for judgment notwithstanding the verdict was directed, Jeffrey was entitled to the benefit of all proper inferences deducible from the evidence. The district court correctly overruled the hospital's motion, and the judgment of the district court is affirmed.

AFFIRMED.