SHELLEY M. SNYDER, GUARDIAN AND NEXT FRIEND OF BRIANNA
D. SNYDER, A CHILD UNDER 18 YEARS OF AGE, APPELLEE,
CROSS-APPELLANT, AND CROSS-APPELLEE, V. CONTEMPORARY
OBSTETRICS & GYNECOLOGY, P.C., AND DAVID H. WEIR, M.D.,
APPELLANTS AND CROSS-APPELLEES, LAWRENCE R. JONES, M.D.,
APPELLEE, CROSS-APPELLANT, AND CROSS-APPELLEE, AND JOHN H.
SCHULTE, M.D., APPELLEE AND CROSS-APPELLEE.

605 N.W.2d 782

Filed January 28, 2000. No. S-98-483.

William M. Lamson, Jr., James W. Ambrose II, and William R. Settles, of Lamson, Dugan & Murray, for appellants

Contemporary Obstetrics & Gynecology, P.C., and David H. Weir.

Denzel R. Busick, of Luebs, Leininger, Smith, Busick, Johnson, Baack, Placzek & Steele, for appellee Shelley M. Snyder.

Fredric H. Kauffman and Terry R. Wittler, of Cline, Williams, Wright, Johnson & Oldfather, for appellee Lawrence R. Jones.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MCCORMACK, J.

## I. FACTUAL BACKGROUND

Shelley M. Snyder, mother of the plaintiff, Brianna D. Snyder, became pregnant with Brianna in 1992. Shelley's obstetrician was defendant David H. Weir, M.D., an employee of defendant Contemporary Obstetrics & Gynecology, P.C. (hereinafter referred to as "COG"). Defendants Lawrence R. Jones, M.D., and John H. Schulte, M.D., were also employees of COG.

Shelley was pregnant for the second time and had suffered from preeclampsia during her first pregnancy. Preeclampsia is a condition in pregnant women which is generally evidenced by elevated blood pressure, protein in the urine, and edema in the face, hands, and feet. Preeclampsia can harm the fetus by causing placental insufficiency and, if left untreated, can progress to eclampsia, which is characterized by coma and convulsive seizures in the pregnant woman.

On December 15, 1992, Shelley saw Weir for a regular office visit. Shelley was experiencing edema in her extremities and had an elevated protein level of 2+ in her urine. Weir ordered that a urine culture be performed to test for a bladder infection.

On December 16, 1992, Shelley went to her job at a local hospital. Shelley had the laboratory technicians at the hospital recheck her urine, and an elevated protein level of 3+ was found. Shelley called COG to check on the results of her tests from the previous day, but was told that the results were not yet available.

On December 17, 1992, a nurse at COG called Shelley and told her that the results of the urine culture had been lost and

that Shelley should have the test redone at a facility closer to her home. COG made an appointment for Shelley at a local clinic to have a urine culture performed. However, when Shelley arrived for the appointment, she was told that the clinic was not equipped to perform a urine culture. Shelley told clinic personnel to call COG and inform them that the test could not be performed.

While at the clinic, Shelley was told that Jones wanted the urinalysis results from the hospital on the previous day faxed to him at COG. Shelley was also told that she should have a urine culture done at the hospital, and she had the culture performed at the hospital on December 17, 1992. On December 19, she was informed that the culture was, at that point, negative.

Shelley awoke on the morning of December 21, 1992, with a severe headache. At about 4 a.m., she began vomiting, and her husband, Michael Snyder, telephoned Schulte, who was on call for COG. Schulte said that Shelley should take Tylenol, elevate her feet, and call Weir the following day. At about 6 a.m., Michael found that Shelley was breathing abnormally and that her tongue was extended and bloody; he was unable to wake her. Shelley was taken by ambulance to the hospital, where she suffered a seizure. An emergency cesarean section was performed to deliver a premature, 1⅓-pound baby girl, Brianna.

Brianna survived, but is severely disabled. Although Brianna may have at least average intelligence, she is visually impaired; has cerebral palsy; and is unable to walk, speak, or eat normally. Brianna requires constant care and may require constant care for the rest of her life.

## II. PROCEDURAL BACKGROUND

Brianna's action against the defendants went to trial in 1997. At the close of Brianna's case, the trial court granted a directed verdict for Schulte, but overruled motions for directed verdict as to the other defendants. Brianna filed a timely motion for new trial to preserve the issue of Schulte's dismissal for appellate review. The defendants again moved for directed verdict at the close of the defense case, and the motions were overruled.

The case was submitted to the jury, but the jury was unable to reach a verdict. In the process of questioning the jurors on the deadlock, it was revealed that the jury agreed for Brianna on the

element of negligence, but was unable to agree on proximate cause. A mistrial was declared.

The defendants filed posttrial motions for judgment notwithstanding the verdict, pursuant to Neb. Rev. Stat. § 25-1315.02 (Reissue 1995). Brianna filed a motion for entry of a partial judgment pursuant to Neb. Rev. Stat. § 25-1314 (Reissue 1995), arguing that the jury's consensus regarding negligence was a "special verdict" on the issue of negligence entitling her to judgment thereon. These motions, and Brianna's motion for new trial, were overruled.

### III. ASSIGNMENTS OF ERROR

Defendants-appellants Weir and COG assign, consolidated and restated, that the trial court erred in (1) admitting the causation testimony of Brianna's expert, Andrew Robertson, M.D.; (2) failing to direct a verdict for COG and Weir due to Brianna's failure to establish causation with the requisite degree of certainty; and (3) failing to direct a verdict for COG and Weir based on Brianna's failure to establish what damages were proximately caused by the defendants' alleged negligence.

Defendant-cross-appellant Jones assigns, consolidated and restated, that the trial court erred in (1) failing to direct a verdict for Jones and (2) giving instruction No. 14, relating to the allocation of damages where a preexisting condition is partially responsible for Brianna's injuries.

Plaintiff-cross-appellant Brianna assigns, consolidated and restated, that the trial court erred in (1) sustaining Schulte's motion for directed verdict and overruling Brianna's motion for new trial therefrom and (2) overruling Brianna's motion for judgment pursuant to § 25-1314.

### IV. STANDARD OF REVIEW

On a motion for judgment non obstante verdicto, or notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *Hulett v. Ranch Bowl of Omaha*, 251 Neb. 189, 556 N.W.2d 23 (1996), *overruled on other grounds, Knoll v.*

*Board of Regents*, 258 Neb. 1, 601 N.W.2d 757 (1999); *McWhirt v. Heavey*, 250 Neb. 536, 550 N.W.2d 327 (1996). In order to sustain a motion for judgment notwithstanding the verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Id.*

■ A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Walkenhorst v. State*, 253 Neb. 986, 573 N.W.2d 474 (1998); *Mahoney v. Nebraska Methodist Hosp.*, 251 Neb. 841, 560 N.W.2d 451 (1997).

■ In reviewing a claim of prejudice from instructions given or refused, the instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error. *Cobb v. Sure Crop Chem. Co.*, 255 Neb. 625, 587 N.W.2d 355 (1998).

■ On appeal from an order of a trial court dismissing an action at the close of the plaintiff's evidence, an appellate court must accept the plaintiff's evidence as true, together with reasonable conclusions deducible from that evidence. *Alexander v. Warehouse*, 253 Neb. 153, 568 N.W.2d 892 (1997); *Cloonan v. Food-4-Less*, 247 Neb. 677, 529 N.W.2d 759 (1995).

■ Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *In re Estate of Myers*, 256 Neb. 817, 594 N.W.2d 563 (1999); *Central States Found. v. Balka*, 256 Neb. 369, 590 N.W.2d 832 (1999).

## V. ANALYSIS

■ We first note that although the jury in this case was not able to agree on a verdict, the defendants have properly appealed from a posttrial motion for judgment notwithstanding the verdict. Section 25-1315.02 authorizes an appeal from the denial of a judgment notwithstanding the verdict after the jury has been discharged as the result of an inability to reach a verdict. See, *Critchfield v. McNamara*, 248 Neb. 39, 532 N.W.2d 287 (1995); *Ditloff v. Otto*, 239 Neb. 377, 476 N.W.2d 675 (1991).

■ We also note that although our disposition of this case requires that it be remanded for a new trial and that we need not reach all of the issues argued by the parties, we nonetheless consider those issues that are likely to recur on retrial. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings. See, e.g., *Floyd v. Worobec*, 248 Neb. 605, 537 N.W.2d 512 (1995); *Sikyta v. Arrow Stage Lines*, 238 Neb. 289, 470 N.W.2d 724 (1991); *State v. Harney*, 237 Neb. 512, 466 N.W.2d 540 (1991); *Denesia v. St. Elizabeth Comm. Health Ctr.*, 235 Neb. 151, 454 N.W.2d 294 (1990).

### 1. WEIR AND COG'S APPEAL

Weir and COG's assignments of error relate to the sufficiency of testimony presented by Brianna's expert witness, Robertson. Specifically, Weir and COG argue that Robertson's testimony was not sufficiently definitive on the issue of causation. Regarding the degree to which Weir's alleged negligence caused Brianna's injuries, Robertson testified on direct examination in relevant part as follows:

Q If we look at Dr. Weir's contact with the patient in the chart from December 15, 1992, until the child was born, do you have an opinion based upon a reasonable degree of medical certainty as to whether his failure to meet the appropriate standard of care as you've described it would have been a proximately contributing cause to the premature birth of Brianna Snyder? Do you have such an opinion?

A Yes.

. . . .

Q What is your opinion?

A My opinion is that since the diagnosis was not made, the appropriate treatment was not undertaken, so we don't know how much longer the pregnancy could have gone on. I think there's reasonable probability that had the diagnosis been made and treatment undertaken, that the pregnancy would have gone on longer and the two most critical things is how old it is and how big it is when its [sic] born. I don't know how long, but statistically somewhere in the range of two to six weeks.

Q And you can state that with a reasonable degree of medical probability?

A Yes.

. . . .

Q And do you have an opinion based upon a reasonable degree of medical probability as to approximately how much longer the pregnancy could have been extended if she had received proper treatment as of December 15, 1992?

. . . .

[A] Yes.

Q And what is your opinion?

. . . .

[A] The range could have been as little as two or three days and probably not over six weeks with the vast majority being between — somewhere between two and six weeks. Without the benefit of any therapy, I can't tell you exactly how long the pregnancy would have been.

. . . .

Q Do you have an opinion as to whether this child would have been born disabled if the pregnancy had been prolonged as long as six weeks?

. . . .

[A] I have an opinion, yes.

[Q] What is your opinion?

. . . .

[A] Well, given the gestational age that Brianna was delivered at which was 25 weeks, the outside probably would have gotten six weeks. I would have expected her to still have some disabilities because she would have been born at less than 32 weeks and that's — and certainly in 1992, that was kind of the cut off where you see problems with prematurity. I would expect those disabilities to be less but she may very well have had some disabilities.

. . . .

Q Do you have an opinion based upon a reasonable degree of medical probability as to whether the child would have been less disabled if the appropriate measures had been instituted on December 15, 1992; do you have such an opinion?

A Yes.

Q And what is that opinion?

A They would have been more likely to work because she was not as sick at that time and the likelihood of prolonging the pregnancy would have been greater. The sicker she is at the time you start your treatment, the less likely you are to gain that extra time that you need.

### (a) Directed Verdict Motions

In a malpractice action involving professional negligence, the burden of proof is upon the plaintiff to demonstrate the generally recognized medical standard of care, that there was a deviation from that standard by the defendant, and that the deviation was the proximate cause of the plaintiff's alleged injuries. *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999). The plaintiff must prove each essential element of the claim asserted by a preponderance of the evidence. *Id.* A defendant's negligence is, therefore, not actionable unless it is a proximate cause of the plaintiff's injuries or is a cause that proximately contributed to them. *Id.*

In other words, proximate causation requires proof necessary to establish that the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff. *Id.* The burden of proving a cause of action is not sustained by evidence from which a jury can arrive at its conclusions only by guess, speculation, conjecture, or choice of possibilities; there must be something more which would lead a reasoning mind to one conclusion rather than to another. *Id.*

Taken in the light most favorable to Brianna, Robertson's testimony supports a finding that Weir's negligence caused at least some of Brianna's injuries. Robertson's testimony, so construed, supports the conclusion that Weir was negligent in failing to diagnose and treat Shelley for preeclampsia; that because of this failure, Shelley's premature delivery of Brianna was sooner than would otherwise have occurred; and that consequently, Brianna's disabilities were greater than they otherwise would have been. In short, this evidence supports the conclusion that Weir's negligence contributed to the injuries suffered by Brianna. This conclusion would satisfy Brianna's burden of

proof. See *id.* Consequently, Weir and COG's assignment of error is without merit.

To the extent that there is uncertainty in Robertson's testimony, it relates not to causation, but, instead, to the degree to which Brianna's injuries were enhanced by the defendants' conduct. In other words, Robertson did not state, with any degree of specificity, exactly how much of Brianna's ultimate disability was directly caused by the defendants. This fact, however, relates not to causation, but to damages, and will be analyzed in the context of another assignment of error.

(b) Admissibility of Robertson's Testimony

The issue with respect to Robertson's testimony is whether his opinion regarding causation is sufficiently certain. This does not entail an analysis of the methods used by Robertson in reaching his conclusions; rather, it is simply a question of whether Robertson's conclusions regarding causation were definitive enough to be relevant evidence on that point. Consequently, this question does not implicate the issues raised in *Phillips v. Industrial Machine*, 257 Neb. 256, 597 N.W.2d 377 (1999) (Gerrard, J., concurring).

Lack of certainty in an expert's opinion is a problem of relevance. *Menkens v. Finley*, 251 Neb. 84, 555 N.W.2d 47 (1996). Because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat. § 27-401 (Reissue 1995), the trial court's decision will not be reversed absent an abuse of discretion. See *Seeber v. Howlette*, 255 Neb. 561, 586 N.W.2d 445 (1998).

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. § 27-401. Thus, for evidence to be relevant under § 27-401, all that must be established is a rational, probative connection, however slight, between the offered evidence and a fact of consequence. *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999). In the instant case, the issues were the standard of care, the defendants' deviation from that standard of care, and the relationship between that deviation and Brianna's injuries. See *Doe v. Zedek*, 255

Neb. 963, 587 N.W.2d 885 (1999). As Robertson's testimony was rationally and probatively connected to those issues, as noted above, we cannot conclude that the trial court abused its discretion in allowing the testimony. Weir and COG's assignment of error is without merit.

### (c) Proof of Damages

Weir and COG's assignment of error regarding Brianna's proof of damages presents the same issues that are raised by Jones' second assignment of error relating to allocation of damages. We will resolve both assignments of error in our analysis of Jones' cross-appeal.

### 2. JONES' CROSS-APPEAL

### (a) Directed Verdict Motion

Jones' first assignment of error is that the trial court erred in not directing a verdict in his favor. First, Jones argues that Brianna failed to present evidence sufficient to show that Jones violated an existing standard of care. In that regard, the following testimony of Robertson was adduced without objection:

Q Do you have any opinions based upon a reasonable degree of medical certainty as to whether Dr. Jones on December 17, 1992, fell below the appropriate standard of care in his care and treatment regarding Mrs. Snyder?

A Yes.

Q And what is your opinion, sir?

A That he[,] once again very similar to Dr. Weir[,] now had a patient who had not just two plus protein but three plus protein in her urine, had no symptoms of urinary tract infection and felt like she had a bladder infection and had no other diagnosis at that time. I think that's inadequate.

Q Could you ascertain from the chart or from Dr. Jones' deposition whether he actually looked at Mrs. Snyder's chart when he was consulted on December 17, 1992?

A I can't tell that he did.

Q If all that occurred on that date was that he was given the three plus protein result and the prior two plus protein result in the urine do you have an opinion based upon a reasonable degree of medical certainty as to whether his

> ordering another urinalysis, doing only that on that date would have met the appropriate standard of care? Do you have an opinion?
>
> A Yes.
>
> Q What is your opinion?
>
> A I think it was inadequate, insufficient. It did not meet the standard.

This testimony, taken in the light most favorable to Brianna, is sufficient to establish that Jones' treatment of Shelley failed to meet the appropriate standard of medical care.

Second, Jones claims that Brianna failed to establish causation with respect to his treatment of Shelley on December 17, 1992. In that regard, Robertson testified as follows:

> Q . . . In regards to December 17, 1992, what measures — do you have an opinion based upon a reasonable degree of medical certainty as to what measures should have been instituted as of December 17, 1992?
>
> A Yes.
>
> Q And what is that opinion?
>
> A The diagnosis of preeclampsia should have been made. An evaluation of Mrs. Snyder to how bad the preeclampsia should have been made [sic]. She should have been put — at that point with three plus protein should have been put at bed rest; probably in the hospital. And consideration for other therapy.
>
> Q What other therapy?
>
> A I think at that particular time with three plus protein, you have to consider the risk of her having a seizure is pretty high. Some type of antenatal therapy, magnesium sulfate or phenobarbital would have been instituted. And at that point she's that sick, that's when I would have given steroids.
>
> Q Do you have an opinion then, Doctor, based upon a reasonable degree of medical certainty if that treatment had been rendered as of that date whether this pregnancy would have been prolonged?
>
> A Yes.
>
> Q And what is your opinion?
>
> . . . .

[A] Once again given the fact that she now had three plus protein, she was sicker, I still think there was the potential to prolong the pregnancy but that potential was less.

. . . .

Q Do you have an opinion as to the amount of time that the pregnancy could have been prolonged as of that time if the proper therapy had been executed?

. . . .

Q I would ask do you have such an opinion based upon a reasonable degree of medical certainty?

. . . .

[A] Yes.

. . . .

Q What is the opinion?

. . . .

[A] I think you're going to get something less than six weeks. Once again, it's an opinion, it's — you're probably in the two-to-four week range when you get into that potent.

. . . .

Q Do you have an opinion as to based upon medical certainty if the proper therapy had been instituted on that date, the disabilities of the child would have been less?

A Yes.

Q And what is your opinion?

. . . .

[A] It's the same thing. The longer the pregnancy goes on, in most instances the less likely the baby is to have long-term problems when it's born. Now you have to take into account how the baby is, mom is doing and the therapy is going to work. She never had the benefit of therapy to know if it was going to work.

Robertson's testimony regarding Jones is effectively the same as his testimony regarding Weir, as analyzed above. Taken in the light most favorable to Brianna, this testimony establishes that Jones' failure to diagnose and treat Shelley's condition on December 17, 1992, proximately caused at least some of the injuries suffered by Brianna. Consequently, the trial court did not err in failing to direct a verdict for Jones.

## (b) Allocation of Damages

Both Jones' second assignment of error and Weir and COG's third assignment of error deal with the ability of the jury, based upon the evidence presented, to allocate how much of Brianna's damages were caused by the defendants' alleged negligence. Weir and COG argue that a directed verdict should have been granted, and Jones argues that the trial court should not have given instruction No. 14, which dealt with the allocation of damages. We first turn to Weir and COG's assignment of error.

Generally, while damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Union Ins. Co. v. Land and Sky, Inc.*, 253 Neb. 184, 568 N.W.2d 908 (1997); *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996). It is the duty of the district court to refrain from submitting to the jury the issue of damages where the evidence is such that it cannot determine that issue without indulging in speculation and conjecture. *Evergreen Farms v. First Nat. Bank & Trust*, 250 Neb. 860, 553 N.W.2d 728 (1996).

Weir and COG argue that Brianna's evidence on damages would allow only speculation and conjecture, such that the trial court should have directed a verdict instead of submitting the case to the jury. See *id.* We disagree.

In fact, Brianna presented a great deal of expert testimony establishing the medical expenses associated with Brianna's birth and pediatric care, the expenses associated with her continuing need for care, the expenses of her several corrective surgeries, and the projected expenses of her care for the remainder of her life. Additionally, the jury was presented with evidence of Brianna's lifestyle and daily activities, such that the jurors were able to discern some of the effects of Brianna's injuries. This evidence was certainly sufficient to allow the jury to determine the amount of damages warranted by Brianna's condition.

The complaint raised by Weir and COG, then, does not relate to speculation regarding the total amount of Brianna's damages. Instead, they are concerned with the jury's ability to establish to what degree those damages were caused by the negligence of the defendants. In other words, Weir and COG are not complaining about the sufficiency of the evidence of damages per se, but with

the lack of evidence supporting a reasoned allocation of damages. This is precisely the issue raised by Jones' assignment of error.

Jones claims that the trial court should not have given instruction No. 14, which provided:

There is evidence that had Shelley Snyder's pregnancy continued to the optimum delivery date the plaintiff would still have been born with disabilities. The defendants are liable only for damages that you find to be proximately caused by their medical negligence. If you find that a defendant's medical negligence caused additional damages, injuries or disabilities, and you cannot separate these damages from the disabilities she nevertheless would have had, then the defendant is liable for all of the damages.

A jury instruction is not error if, taken as a whole, it correctly states the law, is not misleading, and adequately covers the issues. *Dukat v. Leiserv, Inc.*, 255 Neb. 750, 587 N.W.2d 96 (1998). There is no question that the given instruction was a correct statement of the law, as we have, in several cases, approved functionally identical instructions. See, *Wasiak v. Omaha Pub. Power Dist.*, 253 Neb. 46, 568 N.W.2d 229 (1997); *Ketteler v. Daniel*, 251 Neb. 287, 556 N.W.2d 623 (1996); *Kirchner v. Wilson*, 251 Neb. 56, 554 N.W.2d 782 (1996); *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996). Additionally, we note that the given instruction uses the language of NJI2d Civ. 4.09. The instructions contained in the second edition of the Nebraska Jury Instructions are designed to be used when they reflect the law, and the pleadings and the evidence call for such an instruction. See *Nguyen v. Rezac*, 256 Neb. 458, 590 N.W.2d 375 (1999).

The argument raised by Jones is that the instruction was not warranted by the evidence presented in the case. Jones initially argues that the instruction was not warranted because Brianna failed to establish causation. Our analysis of the motions for directed verdict, set forth above, disposes of this claim.

To the extent that Jones, Weir, and COG all claim that the evidence was insufficient to allow the jury to properly allocate damages, their claims are meritless. The evidence was sufficient to support a jury's finding that Brianna was injured and that at least some of those injuries were caused by the defendants' negligence. At that point, under the authority cited above, the bur-

den of producing evidence regarding the proper allocation of damages shifted to the defendants.

In *David v. DeLeon*, 250 Neb. at 116, 547 N.W.2d at 730, an automobile accident case, we said that

> without the admonition that the defendant is liable for all damages if the jury cannot apportion, the instruction would have failed to address the event in which a jury finds that damages were proximately caused by a collision, but is unable to determine precisely what quantum of those damages was not preexisting. This instruction prevents the result of a jury finding that damages were proximately caused by the tortious act, but failing to award damages because it cannot demarcate preexisting illnesses from new losses.

Similarly, in the instant case, a failure to give instruction No. 14 would have failed to address the event in which the jury found that Brianna's damages were caused by the defendants' failure to diagnose and treat preeclampsia, but were unable to determine what quantum of those damages was unavoidable due to the preexisting disease process. Instruction No. 14 would prevent the result of a jury's finding that damages were proximately caused by the defendants' negligence, but would fail to award damages because it cannot demarcate the unavoidable effects of preeclampsia from the effects caused by negligent medical care.

These principles were applied to a factual situation similar to that of the instant case in *Ehlinger v. Sipes*, 155 Wis. 2d 1, 454 N.W.2d 754 (1990). In that case, the defendant doctors failed to properly diagnose the mother's multiple pregnancy, and the mother gave birth prematurely to disabled twins. *Id.* The plaintiff parents alleged that this missed diagnosis was negligent, that it precluded the use of treatments that might have prolonged the pregnancy, and that prolonging the pregnancy might have prevented or reduced the injuries suffered by the twins. *Id.*

After trial, the circuit court granted the defendants' motion to dismiss on the basis that the plaintiffs failed to produce sufficient evidence from which the trier of fact could determine that the defendants' alleged negligence caused the twins' injuries. *Id.* The Supreme Court of Wisconsin reversed this determination, stating:

> We disagree that to establish causation the [plaintiffs] must show that proper diagnosis and treatment *would* have been

successful. We conclude that in a case of this nature, where the causal relationship between the defendant's alleged negligence and the plaintiff's harm can only be inferred by surmising as to what the plaintiff's condition would have been had the defendant exercised ordinary care, to satisfy his or her burden of production on causation, the plaintiff need only show that the omitted treatment was intended to prevent the very type of harm which resulted, that the plaintiff would have submitted to the treatment, and that it is more probable than not the treatment *could* have lessened or avoided the plaintiff's injury had it been rendered. It then is for the trier of fact to determine whether the defendant's negligence was a substantial factor in causing the plaintiff's harm.

(Emphasis in original.) *Id.* at 13-14, 454 N.W.2d at 759.

The court concluded:

In a case such as presented here, where given the natures of the malady and omitted treatment the success of the treatment if instituted is not a matter of reasonable certainty, we refuse to place upon an injured plaintiff the burden of proving what more probably than not *would* have happened had the defendant not been negligent.

(Emphasis in original.) *Id.* at 18, 454 N.W.2d at 761. See, also, *Colburn v. U.S.*, 45 F. Supp. 2d 787 (S.D. Cal. 1998); *Freeman v. Petroff*, 288 Ill. App. 3d 145, 680 N.E.2d 453, 223 Ill. Dec. 720 (1997), *appeal denied* 174 Ill. 2d 559, 686 N.E.2d 1160, 227 Ill. Dec. 4.

The defendants are incorrect in claiming that application of the above-cited authority would require the jury in the instant case to engage in speculation and conjecture. In fact, this is precisely what *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996), and its progeny had intended to avoid. If Brianna's evidence is credited by the jury, as we are required to assume, then the jury need not speculate in order to determine that the defendants proximately caused at least some of the injuries sustained by her. Neither is the jury required to speculate in order to determine the degree to which those injuries are attributable to the defendants as, under *DeLeon*, all of those injuries are attributed to the defendants unless the defendants present evidence contradicting such an assumption. The uncertain interaction between

negligence and preexisting condition does not require specula-
tion on the part of the jury, because *DeLeon* resolves uncertainty
against the defendants.

Jones also claims that the instruction on Shelley's preexisting
condition was incorrect because that instruction applies only to
situations where the preexisting condition and the injury are suf-
fered by the same person and that, in this case, Brianna is arguing
that Shelley's preexisting condition exacerbated her injuries. Under
the circumstances, we find this distinction to be unpersuasive.

The evidence established that preeclampsia is a condition
present only in pregnant women that can profoundly harm both
the pregnant woman and her fetus. It can result not only in a
myriad of possible injuries to the pregnant woman, but in a
reduced blood flow to, and consequent undernourishment of, the
fetus. Given the nature of the disease process, we cannot agree that
preeclampsia is a preexisting condition that is strictly confined to the
pregnant woman. See *Scafidi v. Seiler*, 119 N.J. 93, 574 A.2d 398
(1990) (approving similar jury instruction in context of failure to
treat condition that led to premature birth and death of infant).

The evidence presented at trial established that preeclampsia
was a preexisting condition suffered by both Shelley and
Brianna. Given that evidence, the trial court did not err in giving
instruction No. 14. Jones' second assignment of error and Weir
and COG's third assignment of error are without merit.

### 3. Brianna's Cross-Appeal

#### (a) Directed Verdict for Schulte

Brianna's first assignment of error is that the trial court erred
in directing a verdict for Schulte at the close of her case. A trial
court should direct a verdict as a matter of law only when the
facts are conceded, undisputed, or such that reasonable minds
can draw but one conclusion therefrom. *McLaughlin v.
Hellbusch*, 256 Neb. 615, 591 N.W.2d 569 (1999); *Cobb v. Sure
Crop Chem. Co.*, 255 Neb. 625, 587 N.W.2d 355 (1998).

Brianna contends that the evidence was sufficient to support
the conclusion that Schulte's negligence, during the telephone
call on December 21, 1992, proximately caused some of her
injuries. The testimony offered at trial, however, indicates oth-
erwise. On direct examination, when Robertson was asked if, in

his opinion, Schulte had met Robertson's understanding of the standard of care, Robertson testified:

[A] I think it's more likely than not, [the pregnancy] would not have prolonged for any length of time. I think the difference there is Mrs. Snyder might not have had to have undergone an emergency Cesarean and fetal distress because that was strictly related to her seizure activity. Had she been treated for seizures, the baby may not have to be delivered at that exact moment.

. . . .

Q Do you have an opinion based upon a reasonable degree of probability as to what length of time it could have been prolonged as of that time?

. . . .

Q What is your opinion?

A I think it would have been — you'd be looking at best 24 to 48 hours to get steroid therapy in at that point.

Q Do you have an opinion based upon a reasonable degree of probability as to whether the degree of disability of the child would have been lessened if the pregnancy had been prolonged as of that date?

. . . .

[A] Without knowing whether or not you could have gotten the time for the steroid, if you couldn't have gotten the time for steroid therapy, it would have been no different. If you've gotten time for steroid therapy, there's no question it would improve the outcome.

On cross-examination, Robertson was asked, "[A]ssuming that what the information you've been given is accurate . . . more likely than not that [December 21] phone conversation was irrelevant to the outcome of this delivery?" He conceded, "Yes."

On redirect examination, Robertson testified:

Q . . . [D]o you have an opinion based upon a reasonable degree of medical probability as to whether the delay which occurred between 4:30 a.m. and the time of the actual delivery of the infant on the 21st of December, 1992, caused some injury to Brianna Snyder; do you have an opinion?

A Yes.

Q What's your opinion?

. . . .

[A] It's my opinion that Dr. Schulte had the least oppor-
tunity to make a difference in what happened in the sense
that Mrs. Snyder had gotten real sick from no treatment
and that given the timeframe, there's likelihood that she
probably would have seized once before getting treatment.
And with that, that's going to change it. Whether she
would have had a second seizure or needed an emergency
Cesarean section such that the baby needed to be delivered
at that particular time, that's where I would have — I would
say more likely than not. There are [sic] little time to be
bought but certainly not any significant amount of time.

. . . .

Q Any time that could be bought, would that be benefi-
cial to the infant?

. . . .

[A] Once again, I think if you look at the literature, the
minimum time in '92 would have thought probably was 48
hours and 72 hours was the maximum. In reality it's prob-
ably about 12 hours. Whether there could have been 12
hours bought, that's difficult to say. I would think at best
would be a toss up and it's more likely than not that it
would not have been that length of time.

Even taken in the light most favorable to Brianna, this testi-
mony is insufficient to establish to a reasonable degree of med-
ical certainty that Schulte's conduct was the proximate cause of
any of Brianna's injuries. In fact, even in the light most favor-
able to Brianna, this testimony from Brianna's expert witness
appears to establish precisely the opposite.

The trial court did not err in directing a verdict in favor of
Schulte, as Brianna presented no evidence that Schulte's negli-
gence proximately caused any of her injuries.

### (b) Judgment on Special Verdict

 Brianna claims that she was entitled to judgment on a
special verdict pursuant to § 25-1314, which provides that
"[w]here the verdict is special, or where there has been a special
finding on particular questions of fact, or where the court has

ordered the case to be reserved, it shall order what judgment shall be entered."

Brianna claims that the jury returned a special verdict on the issue of negligence, as contained in the following colloquy, which occurred while the trial court was questioning the jury foreperson on the reported deadlock:

> THE COURT: The bailiff advises me that in your opinion that the jury is deadlocked and is not going to be able to come to a decision in this case?
>
> [Foreperson]: Right.
>
> THE COURT: Is it your opinion that if the Court requested that you continue to deliberate as a jury, that there would be no further movement and a decision would not be entered?
>
> [Foreperson]: My opinion, yeah.
>
> . . . .
>
> THE COURT: . . . I would like the record to reflect that the jurors have deliberated for in excess of two full days at this point. The Court's going to accept the opinions of the jurors and find that a mistrial in this matter shall be and should be and is declared at this time.
>
> . . . as far as the jury's deliberations are concerned, I assume that you never got past the issue of liability as to whether or not the doctors were liable in this matter; is that correct?
>
> [Foreperson]: Right.
>
> THE COURT: Can you tell me without — well, first of all, can you tell me, have you actually conducted a vote on that issue?
>
> [Foreperson]: Yes, we have.
>
> THE COURT: And what was the last result numbers wise?
>
> [Foreperson]: 8/4.
>
> THE COURT: And as far as the concept of finding the doctors negligent and that they caused the injuries, did you get a vote as to that as to whether or not — first of all, may I ask, did you take a vote as for whether or not they found that there was negligence on the part of the doctors?
>
> [Foreperson]: Yes, we did.
>
> THE COURT: And what was the result of that?
>
> [Foreperson]: It was 12.

THE COURT: All of you agree?

[Foreperson]: All of us agreed that there was negligence.

THE COURT: As far as the negligence being the cause of the birth, did you have a vote on that?

[Foreperson]: Yes, we did.

THE COURT: Or the prematurity of the birth, and how did that come out?

[Foreperson]: It was 8 to 4.

. . . .

THE COURT: Can you tell me which?

[Foreperson]: It went — said that he wasn't — that it wasn't a proximate cause.

THE COURT: And four believed?

[Foreperson]: Four said it was the proximate cause.

Brianna contends that this colloquy was a "special verdict" within the meaning of § 25-1314, entitling her to judgment on the issue of negligence. It is evident, however, that this colloquy satisfies none of the statutory prerequisites for a special finding or verdict.

 A special verdict is that by which the jury finds the facts only. Neb. Rev. Stat. § 25-1122 (Reissue 1995). It must present the facts as established by the evidence, and not the evidence to prove them; and they must be so presented that nothing remains to the court but to draw from them conclusions of law. *Id.*

Neb. Rev. Stat. § 25-1121 (Reissue 1995) states:

> In every action for the recovery of money only, or specific real property, the jury, in their discretion, may render a general or special verdict. In all other cases the court may direct the jury to find a special verdict, in writing, upon all or any of the issues and in all cases may instruct them, if they render a general verdict, to find upon particular questions of fact to be stated in writing, and may direct a written finding thereon. The special verdict or finding must be filed with the clerk and entered on the journal.

Neb. Rev. Stat. § 25-1123 (Reissue 1995) provides, in relevant part:

> The verdict shall be written, signed by the foreman, and read by the clerk to the jury, and the inquiry made whether it is their verdict. If any juror disagrees, the jury must be sent out again; but if no disagreement be expressed, and

neither party requires the jury to be polled, the verdict is complete, and the jury discharged from the case.

In the instant case, no written verdict was ever issued, nor was any inquiry made of the jury as a whole regarding the validity of such a verdict, nor was such a verdict filed with the clerk and entered on the journal of the court. See §§ 25-1121 and 25-1123. The "verdict" of the jury foreperson obviously left issues of fact unresolved, such that the trial court was presented with questions beyond conclusions of law. See § 25-1122. Consequently, it is evident that the colloquy between the foreperson and the trial court was not a special verdict, and Brianna was not entitled to any judgment pursuant to § 25-1314. Brianna's assignment of error is without merit.

## VI. CONCLUSION

Finding no merit in the appellants' or cross-appellants' assignments of error, the judgment of the trial court is in all respects affirmed.

AFFIRMED.

WRIGHT, J., not participating.

STEPHAN, J., concurring in part, and in part dissenting.

I concur with the majority's disposition of the issues raised by Brianna's cross-appeal. While I also agree with the majority that there was an issue of fact with respect to the negligence of Weir and Jones, it is my view that their motions for directed verdict should have been granted because there was insufficient evidence to establish a prima facie showing on the issues of proximate cause and damages. I therefore respectfully dissent from that portion of the majority opinion concluding otherwise.

After determining that the evidence as to proximate cause was sufficient to withstand the motions for directed verdict made on behalf of Weir, COG, and Jones, the majority reasons that there is a separate issue as to damages, namely, whether there was sufficient evidence upon which a jury could determine to what degree the alleged damages sustained by Brianna "were caused by the negligence of the defendants." To resolve this issue, the majority relies upon *Ehlinger v. Sipes*, 155 Wis. 2d 1, 454 N.W.2d 754 (1990), a case in which the plaintiffs alleged that the defendant physicians had negligently failed to diagnose

a multiple pregnancy and take appropriate measures to avoid injuries subsequently suffered by the Ehlingers' twins as a result of their premature birth. The critical issue in *Ehlinger* was causation, to which the court stated:

> We conclude that the evidence in this case was sufficient under current Wisconsin law to present the causation question to the trier of fact. To establish causation in Wisconsin, the plaintiff bears the burden of proving that the defendant's negligence was a substantial factor in causing the plaintiff's harm. . . . "The phrase 'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense."

(Citation omitted.) *Id.* at 12, 454 N.W.2d at 758. It was upon this framework that the Wisconsin Supreme Court fashioned the test upon which the majority in this case relies for determining the nature and sufficiency of evidence which the plaintiff was required to present in order to have the issue of causation submitted to the jury.

The problem with grafting the holding in *Ehlinger* into our law is that unlike Wisconsin, Nebraska generally utilizes a "but for" test for determining proximate cause in a personal injury case. We have held that there are three basic requirements that must be met to establish causation: (1) that "but for" the defendant's negligence, the injury would not have occurred; (2) that the injury is the natural and probable result of the negligence; and (3) that there is no efficient intervening cause. *Johnson v. School Dist. of Millard*, 253 Neb. 634, 573 N.W.2d 116 (1998); *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996); *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 248 Neb. 651, 538 N.W.2d 732 (1995). As recently noted in *Reimer v. Surgical Servs. of the Great Plains, P.C., post* p. 671, 605 N.W.2d 777 (2000), we have utilized the "substantial factor" test for proximate cause primarily in cases where the acts of negligence of two or more persons combine to produce a single injury, although one of them alone could not have caused the result. See, e.g., *Kudlacek v. Fiat S.p.A.*, 244 Neb. 822, 509 N.W.2d 603 (1994) (holding that substantial factor test could be

used in determining whether vehicle manufacturer's failure to design crashworthy vehicle was proximate cause of passenger's injuries notwithstanding evidence that driver was negligent); *Miles v. Box Butte County*, 241 Neb. 588, 489 N.W.2d 829 (1992) (holding that where record established that nurse's negligence was substantial factor in bringing about harm to patient notwithstanding evidence that treating physician was also negligent, evidence was sufficient to present question of fact as to whether nurse's actions were proximate cause of injury). Our use of the "substantial factor" test for establishing proximate cause is consistent with the fact that the rule " 'was developed primarily for cases in which application of the but-for rule would allow each defendant to escape responsibility because the conduct of one or more others would have been sufficient to produce the same result.' " *Reimer v. Surgical Servs. of the Great Plains, post* at 677, 605 N.W.2d at 781, quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 41 (5th ed. 1984).

In this case, it is alleged that Brianna sustained specific injuries and damages "[a]s a result of the undiagnosed toxemia, preeclampsia, and seizures which [Shelley] suffered, and the premature delivery of her baby." The jury was initially instructed that "[a] proximate cause is a cause that produces a result in a natural and continuous sequence, and without which the result would not have occurred." Supplemental jury instruction No. 1 given by the trial court further instructed the jury:

> Negligence is a proximate cause if the negligence occurs and produces in a natural and continuous sequence a result, and the result would not have occurred without the negligence. A proximate cause must be a cause from which the damage or injury sued for naturally flows and without which that damage or injury would not have been sustained. It need not, however, be the immediate cause: it is enough that the act complained of set in motion a series of events through which it produced the damage or injury.

Supplemental jury instruction No. 5 contained a further statement regarding proximate cause:

> Supplemental Jury Instruction No. 1 as well as the original jury instruction concerning proximate cause attempt to define proximate cause for the jury. As noted in the state-

ment of the case, before a verdict can be entered in favor of the plaintiff a finding must be made by the jury that the negligence was a proximate cause of certain results.

To be a proximate cause the negligence which occurs must produce a result. Stated another way the result would not have occurred but for the negligence. In that regard the negligence need not be the immediate cause of the result. The negligence must be part of a natural and continuous sequence of events and if the negligence was removed from that sequence of events the result would not have occurred.

Generally, an appellate court will dispose of a case on the theories which were presented to the trial court. *Schindler v. Walker*, 256 Neb. 767, 592 N.W.2d 912 (1999); *Reavis v. Slominski*, 250 Neb. 711, 551 N.W.2d 528 (1996). It is clear that the case was pled and tried upon the "but for" causation test, and in my view, this court is obligated to determine whether a question of fact as to causation was presented under this test. Thus, with respect to the issue of proximate cause, the pertinent question is whether there is any evidence from which a jury could infer with reasonable medical certainty that Brianna sustained an identifiable injury compensable in damages which would not have occurred but for the negligence of Weir and Jones.

Expert testimony established that a term pregnancy is considered to be between 38 and 42 weeks' gestation. Brianna was born at a gestational age of between 25 to 26 weeks, which is considered "extreme prematurity." Following her birth, she was diagnosed as suffering from numerous medical conditions related to her level of prematurity, which included apnea, bradycardia, retinopathy, bronchopulmonary dysplasia, moderate cerebral palsy, and spastic diplegia. Robertson's testimony, viewed in a light most favorable to the plaintiff, establishes that but for the negligence of Weir and Jones, Brianna's birth could have been delayed for a period of 2 to 6 weeks. When asked his opinion as to whether Brianna would have been "born disabled if the pregnancy had been prolonged as long as six weeks," Robertson responded:

Well, given the gestational age that Brianna was delivered at which was 25 weeks, the outside probably would have

gotten six weeks. I would have expected her to still have some disabilities because she would have been born at less than 32 weeks and that's — and certainly in 1992, that was kind of the cut off of where you see problems with prematurity. I would expect those disabilities to be less but she may very well have had some disabilities.

Robertson also testified that Brianna would have been less disabled if the appropriate medical measures had been instituted on December 15, 1992.

The sequence of events leading to Brianna's injuries was placed in motion not by any act or omission by the physicians but by Shelley's preeclampsia which, according to Robertson, was going on "long before" she was seen by Weir on December 15, 1992. Robertson's testimony also establishes that Brianna would have been born prematurely with some disabilities in the absence of any negligence on the part of Weir or Jones. However, neither Robertson nor any other witness identified the nature of such disabilities compared to those actually sustained by Brianna, nor was there any testimony as to morbidity expectations for an infant born at 26 weeks' gestation compared to one born at 32 weeks' gestation, other than general statements that prolonging a pregnancy is advantageous unless there is an indication of fetal distress. In the absence of any evidence differentiating the injuries which Brianna actually sustained from those she would have sustained in the absence of medical negligence, I do not see how a finder of fact could ever identify any specific injury or damage caused by any negligence on the part of the physicians without engaging in speculation and conjecture.

In this regard, I disagree with the majority's application of *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996), to the facts of this case. In *DeLeon*, a person with a preexisting arthritic condition suffered traumatic injuries in a motor vehicle accident. Following *McCall v. Weeks*, 183 Neb. 743, 164 N.W.2d 206 (1969), in which we adopted the theory of the "eggshell-skull" plaintiff whom the negligent defendant must take as he or she finds, we held that the plaintiff was not "required to provide a precise line between the damages directly related to the accident and any preexisting physical or mental condition . . . as a precondition for recovering any damages at all" and that where

there is evidence that damages were proximately caused by a negligent act, the burden of apportioning damages between the tortious injury and the preexisting condition fell upon the defendant. *David v. DeLeon*, 250 Neb. at 115, 547 N.W.2d at 730.

The present case does not involve the infliction of a new traumatic injury upon a preexisting physical condition, as in *DeLeon*, but, rather, the alleged failure of physicians to properly diagnose and treat a progressive prenatal disease process which ultimately led to Brianna's premature birth and associated injuries. The critical question is whether the injuries were caused by the disease itself or by the fact that it was not diagnosed and treated by Shelley's physicians. In my opinion, this must be determined under traditional professional liability concepts, including "but for" causation. Generally, the law does not impose liability upon a physician simply because of a patient's adverse medical outcome. Rather, the party seeking recovery bears the burden of proving, usually through expert testimony, that the physician departed from a generally recognized standard of care and that the deviation was the proximate cause of the injuries alleged. See, *McLaughlin v. Hellbusch*, 256 Neb. 615, 591 N.W.2d 569 (1999); *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999). That being so, it follows that a prima facie showing in a medical negligence action must include evidence distinguishing harm to a patient caused by medical negligence from that which would have occurred in the absence of such negligence in order to establish "but for" causation. In my opinion, the record does not contain sufficient evidence upon which a finder of fact could make this distinction.

I note that some jurisdictions, recognizing the inherent difficulty in proving what would have occurred in the absence of medical negligence, have departed from traditional causation rules to recognize recovery for "loss of a chance" of survival or a better medical outcome. See Robert S. Bruer, Note, *Loss of a Chance as a Cause of Action in Medical Malpractice Cases*, 59 Mo. L. Rev. 969 (1994). For example, some courts have utilized a "relaxed causation" approach by adopting the Restatement (Second) of Torts § 323 at 135 (1965), which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as

necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm . . . .

See, *Thompson v. Sun City Community Hosp., Inc.*, 141 Ariz. 597, 688 P.2d 605 (1984); *Herskovits v. Group Health*, 99 Wash. 2d 609, 664 P.2d 474 (1983); *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978). Other courts treat loss of a chance as a distinct compensable injury, a theory derived from Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353 (1981). See, e.g., *Perez v. Las Vegas Medical Center*, 107 Nev. 1, 805 P.2d 589 (1991); *DeBurkarte v. Louvar*, 393 N.W.2d 131 (Iowa 1986). This court has not adopted either of these positions and cannot reach the issue of whether to do so in this case because it was pled and tried under the "but for" theory of causation.

For these reasons, I would reverse, and remand with directions to dismiss.

CONNOLLY, J., joins in this concurrence and dissent.